Exhibit 13

# THE 9/11 COMMISSION REPORT

## Final Report of the National Commission on Terrorist Attacks Upon the United States

OFFICIAL GOVERNMENT EDITION

For sale by the Superintendent of Documents, U S Government Printing Office
Internet: bookstore gpo gov  Phone· toll free (866) 512-1800;  DC area (202) 512-1800
Fax: (202) 512-2250 Mail: Stop SSOP, Washington, DC 20402-0001

ISBN 0-16-072304-3

XC-  002059

# PREFACE

WE PRESENT THE NARRATIVE of this report and the recommendations that flow from it to the President of the United States, the United States Congress, and the American people for their consideration. Ten Commissioners—five Republicans and five Democrats chosen by elected leaders from our nation's capital at a time of great partisan division—have come together to present this report without dissent.

We have come together with a unity of purpose because our nation demands it. September 11, 2001, was a day of unprecedented shock and suffering in the history of the United States. The nation was unprepared. How did this happen, and how can we avoid such tragedy again?

To answer these questions, the Congress and the President created the National Commission on Terrorist Attacks Upon the United States (Public Law 107-306, November 27, 2002).

Our mandate was sweeping. The law directed us to investigate "facts and circumstances relating to the terrorist attacks of September 11, 2001," including those relating to intelligence agencies, law enforcement agencies, diplomacy, immigration issues and border control, the flow of assets to terrorist organizations, commercial aviation, the role of congressional oversight and resource allocation, and other areas determined relevant by the Commission.

In pursuing our mandate, we have reviewed more than 2.5 million pages of documents and interviewed more than 1,200 individuals in ten countries. This included nearly every senior official from the current and previous administrations who had responsibility for topics covered in our mandate.

We have sought to be independent, impartial, thorough, and nonpartisan. From the outset, we have been committed to share as much of our investigation as we can with the American people. To that end, we held 19 days of hearings and took public testimony from 160 witnesses.

xv

XC- 002067

Exhibit 14

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE WORLD TRADE CENTER            Master Docket No.: 21 MC 100 (AKH)
DISASTER SITE LITIGATION

## CASE MANAGEMENT ORDER No. 3

This Order outlines the timing of and manner in which discovery limited to the subject matters of certain potentially dispositive motions, identified herein, that it is anticipated will be made by one or more Defendants in these actions is to be conducted in the above-captioned World Trade Center Disaster Site Litigation (the "Litigation"). This case management order ("CMO No. 3") is the product of recommendations by Plaintiffs' Liaison and Steering Committee Counsel, Defendants' Liaison and Steering Committee Counsel, and counsel for other parties, but departs from those recommendations and reflects my own requirements in certain requests.

### I.    Definitions

As used herein, the World Trade Center Site shall be defined as the 16-acre site including the sites of the buildings known as 1 World Trade Center, 2 World Trade Center, 3 World Trade Center (a/k/a the Marriot World Trade Center Hotel), 4 World Trade Center, 5 World Trade Center and 7 World Trade Center, as well as the surrounding plaza and underground shopping, parking and public transit facilities. The World Trade Center Site shall also be defined to include the World Financial Center and Winter Garden, the Verizon Building at West and Vesey Streets, the Deutsche Bank Building at Liberty and Greenwich Streets, 90 West Street, St Nicholas Church, and 125 Cedar Street, as well as the Fresh Kills Landfill site, the debris-removal barges, piers and transfer stations. This definition is provided for the sole purpose of

construing the provisions of CMO No. 3 and may not be utilized or cited by the parties for any other purpose.

## II.    Defendants' Motions

Defendants' Liaison and Steering Committee Counsel previously have identified for the Court and for Plaintiffs' counsel certain motions that they anticipate will be made by one or more Defendants and which may be dispositive of some or all of the individual actions in the Litigation. The Court has expressed an interest in having focused and specific discovery ("limited" discovery) undertaken regarding the subject matters of these motions in order to develop an appropriate record for these motions. This CMO No. 3 sets forth the plan for this limited discovery and the Defendants' dispositive motions to follow.

Defendants contemplate the following motions for summary judgment or judgment on the pleadings dismissing some or all of Plaintiffs' claims with prejudice based on various provisions of statute or common law proving immunity to defendants against plaintiffs' claims. Among such provisions are:

A.   The New York State Defense Emergency Act, N.Y. Unconsol. Law §§ 9101-9200;

B.      The New York State and Local Natural and Man-Made Disaster Preparedness Law, N.Y. Exec. Law §§ 20-29-g;

C.      Principles of common law immunity, to be identified, in reasonable detail within ten (10) days of the entry of this Case Management Order;

D.      Principles of federal immunity to be identified in reasonable detail within ten (10) days of the entry of this Case Management Order; and

2

E.   Those Defendants whose alleged liability would derive from their status as owner or lessee of the property at issue (or some part thereof), but who were not in control or possession of the relevant property at the time of Plaintiffs' claimed injuries may also file motions for summary judgment or for judgment on the pleadings, dismissing all or part of the claims against them.  Such defendants, within ten (10) days of the entry of this Case Management Order shall identify with specificity:

    1)  The property involved; and

    2)  The status of defendants with regard to such property; and

F.  Those Defendants whose alleged liability would derive from their status as owner or lessee of the property at issue (or some part thereof), but who were not in control or possession of the relevant property at the time of Plaintiffs' claimed injuries shall produce the specific documents reflecting the defendant's status and that of all others relating to the property.

3

### III.    Order of Discovery

*A.    Defendants' Preliminary Disclosure of Reasonably Ascertainable Information Relevant To Their Motions And Detailed Chronological Declarations*

    **1.    Briefs And Opinions Relating To Previously Filed Dispositive Motions In Other World Trade Center Litigations**

Within five (5) days of the entry of this CMO No. 3, Defendants' Liaison and Steering Committee Counsel shall provide Plaintiffs' Liaison and Steering Committee Counsel and the Court with all judicial opinions, previously filed briefs and supporting documentation in other World Trade Center Litigations not pending before this Court that are in Defendants' possession and relate to the subject matters of the motions identified herein.

    **2.    Preliminary Disclosure Of Organizations Involved In Rescue, Recovery, Debris Removal And/Or Construction At The World Trade Center Site And Documents Of Which Defendants Are Currently Aware And Intend To Rely Upon In Support Of The Motions Described Herein**

Within ten (10) days of the entry of this CMO No. 3, Defendants' Liaison and Steering Committee Counsel shall provide to Plaintiffs' Liaison and Steering Committee Counsel, a list identifying all city agencies and non-city entities that worked at or were in any way involved in the rescue, recovery, cleanup, debris removal and/or construction at the World Trade Center Site. Within thirty (30) days of the entry of this CMO No. 3, Defendants' Liaison and Steering Committee Counsel shall also provide to Plaintiffs' Liaison and Steering Committee Counsel copies of documents, if any, of which Defendants are then aware, of which Defendants intend to rely in support of their motions.

4

3.    **Defendants' Detailed Chronological Declarations**

Within thirty (30) days of the entry of this Case Management Order, each Defendant (except, as to the Contractor Defendants, only the four prime Contractors—Bovis, Turner, Tully, and Amec) shall provide to Plaintiffs' Liaison and Steering Committee Counsel a detailed chronological declaration that shall set forth the key arguments that the Defendant anticipates may be made to support the anticipated motions identified herein. In addition to key arguments then anticipated, each Defendant's detailed chronological declaration shall also set forth the following information.

(a)    The scope of work that the Defendant performed at the World Trade Center Site;

(b)    Where the Defendant performed work at the World Trade Center Site;

(c)    The dates when the Defendant began work, performed work, and concluded work at the World Trade Center Site;

(d)    Whether the Defendant entered into any contract for the work done at the World Trade Center Site, as well as copies of such contracts, if any exist;

(e)    The Defendants shall also disclose the internal "chain of command" structure for each entity during the relevant time period;

(f)    Defendants' declarations shall include: all declarations and orders issued by City, State and Federal agencies and departments governing: A) Occupational safety and health of workers at the site; and B) the provision of respiratory equipment to workers at the site and C) the access of workers, including firefighters, to the site;

5

(g)    The area of the World Trade Center Site the Defendant was assigned to, if

applicable; and maps of the World Trade Center Site depicting its division into

quadrants, to the extent the Defendant possesses such maps and if any such maps

in fact exist.

(h)  Information concerning Defendants and/or subcontractors involved in

producing or providing respirators, air quality, or safety at the World Trade

Center site.


Defendants shall have the duty to supplement all discovery obligations within five days

after learning of information which, had it been known, should have been disclosed pursuant to

this CMO.


**B.**    ***Identification of and Discovery Requests to City Agencies and/or Departments***

    **1.**    **Plaintiffs' Identification of City Agencies and/or Departments From Which**
            **They Intend to Seek Discovery and Related Discovery Requests**

Within twenty (20) days of the entry of this CMO No. 3, Plaintiffs' Liaison and Steering

Committee Counsel shall provide to Defendants' Liaison and Steering Committee Counsel a list

identifying the agencies and/or departments of the City of New York from which Plaintiffs seek

documents and information regarding the subject matters of the motions identified herein.

Within fifty (50) days of the entry of this CMO NO. 3, Plaintiffs' Liaison and Steering

Committee Counsel shall provide to Defendants' Liaison and Steering Committee Counsel a

detailed chronological declaration that shall set forth the key arguments that Plaintiffs then

anticipate may be asserted in opposition to Defendants' anticipated motions identified herein.

The Court will hold a Case Management Conference on Monday, April 18, 2005, at 4:00 P.M. to regulate further discovery, the filing of motions and oppositions and replies, and to entertain further case management recommendations.

SO ORDERED

Alvin K. Hellerstein, U.S.D.J.

Dated: New York, New York
     February 7, 2005

CONSENTED TO:

Plaintiffs' Liaison Counsel

Plaintiffs' Liaison Counsel

By: Andrew Carboy, Esq.

By: Paul J. Napoli

Dated: New York, New York
     February ___, 2005

CONSENTED TO:

Defendants' Liaison Counsel

Defendants' Liaison Counsel

By: James E. Tyrrell, Esq.

By: Richard A. Williamson

Dated: New York, New York
     February ___, 2005

7

Exhibit 15

```
1    54ICWTCC

2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
3   ------------------------------x

4       In Re.:

5   WORLD TRADE CENTER DISASTER SITE

6   LITIGATION,

7
                                      New York, N.Y.
8
                                      21 mc 100
9
    ------------------------------x
10
                                      April 18, 2005
11                                    4:15 p.m.

12  Before:

13                  HON. ALVIN K. HELLERSTEIN,

14                                      District Judge

15                      APPEARANCES

16  WORBY, GRONER, EDELMAN, NAPOLI & BERN,
         Attorneys for Plaintiffs,
17  PAUL NAPOLI,
    WILLIAM GRONER,
18  WILLIAM J. DUBANEVICH,
         of Counsel.
19
    SULLIVAN, PAPAIN, BLOCK, MCGRATH & CANNAVO, P.C.
20       Attorneys for Plaintiffs,
    ANDREW J. CARBOY,
21  FRANK FLORIANI,
         of Counsel.
22
    LATHAM & WATKINS,
23       Attorneys for Defendants Westfield Parties,
    PETER ROSEN,
24  SHANE FRIEDMAN,
         of Counsel.
25
```

```
 1   LATHAM & WATKINS,
          Attorneys for City of New York and contractor Defendants,
 2   JAMES E. TYRRELL, JR.,
     JOSEPH E. HOPKINS,
 3        of Counsel.

 4   FLEMMING, ZULOCK & WILLIAMSON, LLP,
          Attorneys for World Trade Center parties, Port
 5        Authority of New York and New Jersey,
     RICHARD A. WILLIAMSON,
 6   THOMAS A. EGAN,
          of Counsel.
 7
     McDERMOTT WISE & EMERY, LLP,
 8        Attorneys for WTC Captive Insurance Company,
     MARGARET H. WARNER,
 9        of Counsel.

10   LONDON, FISCHER, LLP,
          Attorneys for Defendante Turner entities,
11   JOHN E. SPERLING,
          of Counsel.
12
     NEW YORK CITY LAW DEPARTMENT,
13        Attorneys for Defendant City of New York,
     KEN BECKER,
14   GARY SHAFFER,
     Assistant Corporation Counsel, of Counsel.
15
     OHRENSTEIN & BROWN, LLP,
16        Attorneys for Defendant Trinity Centre, LLC,
     GAIL RITZERT,
17        of counsel.

18                         ----------

19   dEX
               (Case called)

               THE COURT:  I trust that you all have the

     agenda that has been distributed.
                    We can make comments and if we have to, add to the
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1      MR. TYRRELL:  Your Honor, respectfully, I don't

2 believe we can complete our work with respect to the federal

3 government by that schedule.  It's just not going to be able to

4 happen in that time period.  There are too many agencies that

5 are involved, we are focusing on the specific documents that we

6 want, but that has yet to start.  I have no problem with

7 completing the things that counsel says he wants and be open if

8 he wants something else, but I would not be honest to the court

9 if I didn't say I don't think we are going to finish.

10     THE COURT:  What federal agencies are involved?

11     MR. TYRRELL:  There is about eight or ten of them,

12 FEMA, EPA, OSHA, Army Corps of Engineers.  Your Honor, there is

13 just a whole group of them that have documents indicating that

14 they exercised control over the site, we believe, with respect

15 to specific functions.

16     THE COURT:  If you have eight agencies claiming to

17 exercise control, you probably don't have any control.  You are

18 going to make a case out of FEMA, EPA and OSHA.  There may be

19 others involved.

20     MR. TYRRELL:  Your Honor, let's me give you an

21 example.  The Army Corps of Engineers dealt with the whole

22 question of the bathtub built around the foundation.  We are

23 certainly going to argue that all of the activities in removing

24 all of that debris to get down to the bathtub for state

25 purposes and for federal purposes were part of what should be

1    immunized.

2        THE COURT:  So you have four, FEMA, EPA, OSHA, and the

3    Army Corps of Engineers.

4        MR. TYRRELL:  Your Honor, there are others.

5        THE COURT:  I am sure there are others, but I don't

6    know that you have to do this to a point of infinity or the

7    opposite.  Work with the four agencies, and there can't be that

8    many individuals either.  I will be receptive to an enlarged

9    time if after thought and discussion you can identify a finite

10   number of witnesses of these four agencies to make your report.

11       MR. TYRRELL:  Your Honor, we will report

12   appropriately.

13       THE COURT:  All right.  I am going to assume that you

14   can conclude this by June 30.  I understand that my projections

15   may be too optimistic, and by the beginning of June, you can

16   probably let me know that they are too optimistic and you can

17   give me a projection of some additional time, but I think you

18   will need to show that you have been diligent in taking

19   depositions up to that point.  So I think we need to schedule a

20   meeting for early July, July 13 at 4 o'clock.

21       Before that date, I would look to the results of the

22   meeting where the defendants and plaintiffs come together and

23   defined their needs in a narrow way.  Otherwise, I think I

24   would be happier if we can get a briefing schedule for motions.

25       Have I covered all the points in IV?

```
1              MR CARBOY:  Yes, you have.

2              THE COURT:  Mr. Williamson?

3              MR. WILLIAMSON:   I think that covers everything, your

4    Honor.

5              THE COURT:   Then we have the next conference date,

6    July 13 at 4 o clock.

7              All right.  We have a pleasant Memorial Day weekend to

8    look forward to and a pleasant July 4 weekend to look forward

9    to.   I will see you you again July 13.

10                                 -0-

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Exhibit 16

Page 1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA,          .          Criminal No. 1:01cr455
                                   .
        vs.                        .          Alexandria, Virginia
                                   .          March 21, 2006
ZACARIAS MOUSSAOUI,                .          9:00 a.m.
a/k/a Shaqil, a/k/a                .
Abu Khalid al Sahrawi,             .
                                   .
            Defendant.             .
                                   .

.   .   .   .   .   .   .   .   .   .

TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:          ROBERT A. SPENCER, AUSA
                             DAVID J. NOVAK, AUSA
                             DAVID RASKIN, AUSA
                             United States Attorney's Office
                             2100 Jamieson Avenue
                             Alexandria, VA 22314


FOR THE DEFENDANT:           EDWARD B. MAC MAHON, JR., ESQ.
                             P.O. Box 903
                             107 East Washington Street
                             Middleburg, VA 20118
                               and
                             ALAN H. YAMAMOTO, ESQ.
                             643 South Washington Street
                             Alexandria, VA 22314-3032


(APPEARANCES CONT'D. ON FOLLOWING PAGE)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

Anneliese J. Thomson
(703)299-8595

Page 2

```
 1     APPEARANCES:  (Cont'd.)
 2     FOR THE DEFENDANT:              GERALD THOMAS ZERKIN
                                       KENNETH P. TROCCOLI
 3                                     ANNE M. CHAPMAN
                                       Assistant Federal Public Defenders
 4                                     Office of the Federal Public
                                       Defender
 5                                     1650 King Street
                                       Alexandria, VA 22314
 6
 7     COURT SECURITY OFFICER:         CHRISTINE GUNNING
 8
       ALSO PRESENT:                   PAM BISHOP
 9
10     OFFICIAL COURT REPORTER:        ANNELIESE J. THOMSON, RDR, CRR
                                       U.S. District Court, Fifth Floor
11                                     401 Courthouse Square
                                       Alexandria, VA 22314
12                                     (703)299-8595
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Anneliese J. Thomson
(703)299-8595

Electronically signed by Anneliese Thomson (501-170-180-8434)

c0adfa55-d8c9-406f-bd3d-3322f549efe4

Page 13

1            Now, that's not a problem for you-all, but I've got a

2       lawyer here who was charged with a great deal of responsibility,

3       as I still understand it, in working with the aviation portion of

4       this case.  I mean, she was involved in getting documents to

5       witnesses, presenting witnesses with documents to see whether they

6       should be declassified.

7            I have no idea what went on in that process, and because

8       I have an image now of a person who perhaps out of overzealousness

9       or whatever the motivation or loyalty to the aviation industry in

10      trying to protect her clients from civil liability, for whatever

11      motivation, was way across the line in what is appropriate

12      behavior for an attorney, let alone a government attorney.

13           So there is, I think, in this record -- and whether

14      we'll ever be able to sort it out in a reasonable amount of time,

15      I don't know -- the potential problem about whether other aspects

16      of the aviation evidence in this case have been interfered with.

17           I mean, the defense had a right to fair access, to fair

18      discovery.  Now, the record of this case is so long, as you-all

19      argued, and so voluminous that your position has essentially been

20      much of this evidence was generated long before Ms. Martin got

21      involved at least for preparing for trial, that much of it's been

22      presented in other fora, and therefore, the defense should have

23      confidence that they've had access to all the relevant material,

24      but Martin's conduct cut in two directions.

25           One, it tainted your affirmative evidence, but two, it

Anneliese J. Thomson
(703)299-8595

Page 43

```
 1    Our prosecution team has in some fashion.

 2              Now, obviously, they know where the records are, and

 3    they'd bring them there.

 4              THE COURT:  Let me just stop you.  Had the civil

 5    aviation litigation commenced at the time you did that discovery

 6    review, do you know?

 7              MR. NOVAK:  I really don't know.  I don't know when it

 8    commenced, Judge.

 9              THE COURT:  All right.

10              MR. NOVAK:  My guess is yes, and Mr. Spencer is

11    whispering he thinks it's true, too.  I mean, I -- but I don't

12    want to say something that -- I'm obviously very sensitive on this

13    issue, so I want to make sure I'm crystal clear about what I know

14    the facts are.

15              THE COURT:  Because one of the additional problems --

16    and this is just based on what I've read in the paper -- would

17    appear to be is Ms. Martin may have been wearing two hats in this

18    matter; that is, if she's defending -- or assisting in the defense

19    of some FAA people in a civil case and then assisting you with

20    discovery in a criminal case --

21              MR. NOVAK:  Right.

22              THE COURT:  -- where, you know, you're looking at the

23    potential liability of --

24              MR. NOVAK:  Sure.

25              THE COURT:  It's a very different path --
```

Electronically signed by Anneliese Thomson (501-170-180-8434)                    c0adfa55-d8c9-406f-bd3d-3322f549efe4

Exhibit 17



**U.S. Department of Justice**

*United States Attorney*

*Eastern District of Virginia*

*2100 Jamieson Avenue*
*Alexandria, Virginia 22314*

March 13, 2006

FILED

MAR 1 3 2006

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

<u>**Ex Parte — Under Seal**</u>

Hon. Leonie M. Brinkema
United States District Judge
401 Courthouse Square
Alexandria, VA 22314

<u>By Hand Delivery</u>

Re:    <u>U.S. v. Zacarias Moussaoui</u>; Crim. No. 01-455-A

Dear Judge Brinkema:

      We write *ex parte* to inform the Court of a possible violation of the sequestration order as it relates to FAA witnesses.  Late in the afternoon on Friday, March 10, 2006, we learned that Carla Martin, an attorney for the Transportation Safety Administration, provided a copy of the transcript from the first day of trial to one of the witnesses from the FAA, Lynne Osmus.  Ms. Osmus did not read the transcript.  We then investigated Ms. Martin's contact with other current/past employees of FAA, whom Ms. Martin represented in this case (she has since been replaced).  We learned over the weekend that Ms. Martin sent e-mails with the transcript from the first day to the following potential witnesses:

| Name of Witness | Side Calling Witness | Read E-Mail? | Read Transcript? |
|---|---|---|---|
| Lynne Osmus | Gov't | Yes | No |
| Claudio Manno | Gov't | Yes | Yes |
| Lee Longmire | Gov't | Yes | No |
| Pat McDonnell | Defense | Yes | No |
| Robert White | Defense | Yes | No |
| Matthew Kormann | Defense | Yes | Yes |
| John Hawley | Defense | Unknown | Unknown |

We have been unable to contact Mr. Hawley to determine whether he reviewed the e-mails or the

1671

transcript.

    We view Ms. Martin's conduct as reprehensible and we frankly cannot fathom why she
engaged in such conduct.  As soon as we learned of her conduct, we contacted her supervisors
and engaged in an investigation which yielded the above results.  We also notified defense
counsel of the conduct by letter, a copy of which is attached.

    We submit this letter *ex parte* because we ask the Court to review Ms. Martin's e-mails,
which we enclose, to determine whether they must be produced to defense counsel.  As noted in
the letter to defense counsel, one e-mail generated a response from Ms. Osmus and her response
has been turned over as Jencks material.  The rest of the e-mails consist of Ms. Martin
pontificating about the openings, wrongly understanding the proof that the Government intends
to offer.  In our view, Ms. Martin's misguided opinions are not Brady material because she is not
a fact witness.  In addition, Ms. Martin was an attorney working on this case, and her e-mails
consist of her opinions about on-going litigation prepared as part of her preparation for the
litigation and, therefore, may constitute attorney work product.  As noted above, we have
provided notice to the defense that potential witnesses have learned of the contents of the
opening statements and one portion of Agent Anticev's testimony, and this disclosure may be the
subject of cross-examination.  For this reason, we respectfully submit that Ms. Martin's e-mails
should not be produced to defense counsel.

                                Respectfully submitted,

                                Paul J. McNulty
                                United States Attorney

By:

                                Robert A. Spencer
                                David J. Novak
                                David Raskin
                                Assistant United States Attorneys



U.S. Department of Justice

*United States Attorney*

*Eastern District of Virginia*

2100 Jamieson Avenue  (703)299-3700
Alexandria, Virginia 22314

March 13, 2006

Edward B. MacMahon, Jr., Esq.
Alan Yamamoto, Esq.
Gerald Zerkin, Esq.
Ken Troccoli, Esq.

Hand-delivery

        Re:    United States v. Zacarias Moussaoui; Crim. No. 01-455-A

Dear Counsel:

        We write to inform you of a possible violation of the sequestration order as it relates to
FAA witnesses.  Late in the afternoon on Friday, March 10, 2006, we learned that Carla Martin,
an attorney for the Transportation Safety Administration, provided a copy of the transcript from
the first day of trial to one of the witnesses from the FAA, Lynne Osmus.  Ms. Osmus did not
read the transcript.  We then investigated Ms. Martin's contact with other current/past employees
of FAA, whom Ms. Martin represented in this case (she has since been replaced).  We learned
over the weekend that Ms. Martin sent e-mails with the transcript from the first day to the
following potential witnesses:

| Name of Witness | Side Calling Witness | Read E-Mail? | Read Transcript? |
|---|---|---|---|
| Lynne Osmus | Gov't | Yes | No |
| Claudio Manno | Gov't | Yes | Yes |
| Lee Longmire | Gov't | Yes | No |
| Pat McDonnell | Defense | Yes | No |
| Robert White | Defense | Yes | No |
| Matthew Kormann | Defense | Yes | Yes |
| John Hawley | Defense | Unknown | Unknown |

We have been unable to contact Mr. Hawley.  When we learn whether he reviewed the e-mail
and the transcript, we will promptly let you know.

Additionally, Ms. Osmus responded to one of Ms. Martin's e-mails about the possible subject of her testimony. We enclose a copy of that e-mail as part of Ms. Osmus's <u>Jencks</u> material.

Ms. Martin's e-mails contained portions of the opening statements from both sides regarding the FAA evidence. She also included, however, a comment about the testimony of Agent Anticev, stating that he "got tripped up on the Murad issue of flying a plane into the CIA bldg., stating that before 9/11 'no one had ever thought about flying an airplane into a building.'" We are providing a copy of all of Ms. Martin's e-mails to the Court for an *ex parte* determination as to whether they must be produced in discovery.

                              Sincerely,

                              Paul J. McNulty
                              United States Attorney

              By:

                              Robert A. Spencer
                              David J. Novak
                              David Raskin
                              Assistant United States Attorneys

**Novak, David (USAVAE)**

| | |
|---|---|
| **From:** | Kerner, Francine [▓▓▓▓▓▓▓▓▓▓▓▓ |
| **Sent:** | Saturday, March 11, 2006 11:57 AM |
| **To:** | Novak, David (USAVAE) |
| **Subject:** | FW: Got your message |

```
-----Original Message-----
From: Martin, Carla <TSA OCC>
Sent: Sat 3/11/2006 9:53 AM
To:    Kerner, Francine
Cc:
Subject:    FW: Got your message


FYI
-----Original Message-----
From: ▓▓▓▓▓▓▓▓▓▓▓▓▓
Sent: Wednesday, March 08, 2006 8:15 AM
To: Carla
Subject: Got your message
```

And agree w need to be careful in describing how these measures would have impacted the attack, and will be prepared.  I don't support including 100percent gate screening...couldn't be done in the shortterm, which is why CAPPS was used to identify who would get the gate screening.

1

Novak, David (USAVAE)

| | |
|---|---|
| **From:** | Kerner, Francine [████████████] |
| **Sent:** | Saturday, March 11, 2006 1:57 PM |
| **To:** | Novak, David (USAVAE) |
| **Subject:** | Fw: Moussaoui Transcripts |

**Attachments:** 3-6-06 1.PDF; 3-6-06.1a.pdf

3-6-06 1.PDF (780 KB)    3-6-06.1a.pdf (5 MB)

            Here is the email that went to Pat. I left you a voice mail. When
Carla went into the office today to check her records, she determined that she sent the
transcript to TSA witnesses too.  I will be following up with additional email.


-----Original Message-----
From: Martin, Carla <TSA OCC> ████████████████████
To: Kerner, Francine <████████████████
Sent: Sat Mar 11 12:32:01 2006
Subject: FW: Moussaoui Transcripts


<<3-6-06 1.PDF>>

-----Original M <<3-6-06.1a.pdf>> essage-----
From: Martin, Carla <TSA OCC>
Sent: Wednesday, March 08, 2006 12:40 PM
To: ████████████
Subject: FW: Moussaoui Transcripts


Pat:  here are the opening statements-unfortunately, there are big gaps that the defense
can exploit:


 Among the highlights:


"The FAA is responsible for commercial airline security in the United States.  Where the
FBI would be the offense looking for the plot, had Moussaoui not lied, the FAA would be
the defense."

 That "CAPPS (the "computer assisted passenger preselection system" (sic) would have been
changed to look not for explosives but for small knives and box cutters, and that would
have prevented the terrorists from getting on the plane and getting on the plane with the
weapons they used to turn those aircraft into weapons to kill Americans."

"It would have been a very straightforward effort for the FAA to keep those hijackers and
to keep anyone with a knife or a box cutter off a plane."

 "Because the FAA before 9/11 was concerned about people smuggling explosives in
checked luggage onto planes.  They weren't concerned at that point about people taking
over a plane with a primitive weapon."

 The defense, essentially responded by saying "what the Govt. wants you to believe is
only a dream, and its most seductive quality is that we all wish it had come true, but it
is only a dream."

Today, the FBI agent on the stand got tripped up on the Murad issue of flying a plane into the CIA bldg., stating that before 9/11 "no one had ever thought about flying an airplane into a building."

and p. 59, from the defense:  "The evidence in this case will be that every measure taken after 9/11 to protect airline pax could have been taken before, and the Govt. and the airlines' inability to adapt to the new threat of suicde hijackings was the fundamental weakness most plainly exploited by the real hijackers on September 11th."

As you can see, Claudio, Lynne, Ed Soliday and Larry Wannsley have their work cut out for them, and you may as well.

Carla

--

2

**Novak, David (USAVAE)**

| | |
|---|---|
| **From:** | Kerner, Francine [⬛⬛⬛⬛⬛⬛⬛⬛⬛] |
| **Sent:** | Saturday, March 11, 2006 2:17 PM |
| **To:** | Novak, David (USAVAE) |
| **Subject:** | Fw: Moussaoui Transcripts |

**Attachments:** 3-6-06 1.PDF; 3-6-06.1a.pdf


3-6-06 1.PDF (780 KB)


3-6-06.1a.pdf (5 MB)

```
-----Original Message-----
From: Martin, Carla <TSA OCC> <⬛⬛⬛⬛⬛⬛⬛⬛>
To: Kerner, Francine <⬛⬛⬛⬛⬛⬛⬛⬛⬛>
Sent: Sat Mar 11 13:31:45 2006
Subject: FW: Moussaoui Transcripts


  <<3-6-06 1.PDF>>

-----Original M <<3-6-06.1a.pdf>> essage-----
From: Martin, Carla <TSA OCC>
Sent: Tuesday, March 07, 2006 4:54 PM
To: White, Robert L <Intelligence TSI>; Hawley, John; Kormann, Matthew
Cc: Stauffer, Stefanie; Longmire, Lee
Subject: FW: Moussaoui Transcripts
```

FYI:  Among the highlights:

"The FAA is responsible for commercial airline security in the United
States.  Where the FBI would be the offense looking for the plot, had
Moussaoui not lied, the FAA would be the defense."

 That "CAPPS (the "computer assisted passenger preselection system"
(sic) would have been changed to look not for explosives but for small
knives and box cutters, and that would have prevented the terrorists
from getting on the plane and getting on the plane with the weapons they
used to turn those aircraft into weapons to kill Americans."

"It would have been a very straightforward effort for the FAA to keep
those hijackers and to keep anyone with a knife or a box cutter off a
plane."

    "Because the FAA before 9/11 was concerned about people
smuggling explosives in checked luggage onto planes.  They weren't
concerned at that point about people taking over a plane with a
primitive weapon."

    The defense, essentially responded by saying "what the Govt.
wants you to believe is only a dream, and its most seductive quality is
that we all wish it had come true, but it is only a dream."

    Today, the FBI agent on the stand got tripped up on the Murad
issue of flying a plane into the CIA bldg., stating that before 9/11 "no
one had ever thought about flying an airplane into a building."

Carla

--

## Novak, David (USAVAE)

| | |
|---|---|
| **From:** | Martin, Carla <TSA OCC> [██████████████] |
| **Sent:** | Saturday, March 11, 2006 5:28 PM |
| **To:** | Kerner, Francine |
| **Subject:** | FW: Got your message |

-----Original Message-----
**From:** Martin, Carla <TSA OCC>
**Sent:** Wednesday, March 08, 2006 11:52 AM
**To:** ██████████████
**Subject:** RE: Got your message

Lynne-let me put it this way: my friends Jeff Ellis and Chris Christenson, NY lawyers rep. UAL and
AAL respectively in the 9/11 civil litigation, (and rep. Ed S. and Larry W. here) all of us aviation
lawyers, were stunned by the opening. The opening has created a credibility gap that the defense can
drive a truck through. There is no way anyone could say that the carriers could have prevented all short
bladed knives from going through-Dave MUST elicit that from you and the airline witnesses on direct,
and not allow the defense to cut your credibility on cross, (just as they did yesterday with the FBI
witness) by saying, "do you really believe, as the prosecution has stated, that all knives could have been
found, when there are x-thousands of domestic flights daily in the US, that even now post 9/11 the
screener detection rates are very law, and that's all it would have taken to prevent 9/11? That's all he
would really need to say.

    -----Original Message-----
    **From:** ██████████████
    **Sent:** Wed 3/8/2006 8:14 AM
    **To:** Carla
    **Cc:**
    **Subject:** Got your message

    And agree w need to be careful in describing how these measures would have
    impacted the attack, and will be prepared. I don't support including
    100percent gate screening...couldn't be done in the shortterm, which is why
    CAPPS was used to identify who would get the gate screening.

## Novak, David (USAVAE)

| | |
|---|---|
| **From:** | Martin, Carla <TSA OCC> ███████████████ |
| **Sent:** | Saturday, March 11, 2006 5:29 PM |
| **To:** | Kerner, Francine |
| **Subject:** | FW: Security Counter-Measures |

-----Original Message-----
**From:** Martin, Carla <TSA OCC>
**Sent:** Tuesday, March 07, 2006 6:32 PM
**To:** ███████████████
**Cc:** ███████████████
**Subject:** Security Counter-Measures

Lynne:

I don't want you to respond to this by email, but I want you to think about this: I am of the opinion, based on what was said in the opening, (and I am VERY CONCERNED about this opening) and how the defense can exploit it-i.e., the fact that by merely finding all the "primitive weapons" (assuming that could be done) that that's all it would take to prevent the 9/11 attacks from happening? I don't think so.

If you look at the Exhib. list , as I said yesterday, we would have had a measure to initiate 100 per cent gate screening with hand-helds before boarding the aircraft, but FAR MORE IMPORTANTLY-all of these hijackers, particularly Atta, and Jarrah, were well trained in hand to hand combat. Assuming some of them got on board the plane, we know that many things could have been utilized on the aircraft to intimidate and to kill people with. Therefore: we MUST emphasize the deterrent value of the measures-i.e., putting up big signs at the screening checkpoints re knives, the scanning of the names through the pax reservation systems, 100 per cent gate screening of pax, but more importantly, assuming they actually got on the plane, we would have had to have some provision that forbid the cockpit from opening the door for any reason, that F/A's could not use their keys to open the doors. Something, to take into account that the banning of small knives alone would NOT have prevented the attacks from going forward-but that the deterrent value of knowing that security measures had been stepped up, would have caused them to re-think their plans, and thus thwart them from going forward.

This is what I would have said in the opening:

"That the multilayered system of aviation security -which you will see examples of in this case-which the FAA had initiated before, and would have initiated again, a multilayered, redundant system of security counter-measures involving close cooperation between the FAA and the regulated air carriers who would implement such measures-

These measures would have acted as a deterrent to the hijackers and their deadly plans to take over these aircraft, and would have thwarted the attacks."

Unfortunately, we can't redo this now.


Carla

FW: Moussaoui Transcripts

## Novak, David (USAVAE)

| | |
|---|---|
| **From:** | Martin, Carla <TSA OCC> [██████████████] |
| **Sent:** | Saturday, March 11, 2006 6:17 PM |
| **To:** | Kerner, Francine |
| **Subject:** | FW: Moussaoui Transcripts |

Francine: as we discussed, the quote below of the FBI witness was taken from a Fox News website article on Tues. Mar. 7th. Here's the link:

www.foxnews.com/story/0,2933,187021,00.html?sPage=specialsections.foxnews/lawcenter

-----Original Message-----
From: Martin, Carla <TSA OCC>
Sent: Wednesday, March 08, 2006 11:38 AM
To: ██████████████
Subject: RE: Moussaoui Transcripts

Claudio-Matt has said he can live with the substitution, except for one small part, which he says is incorrect-and I will go over this with you-I need to pick it up downstairs. More importantly, re the issue of did we ever explore the scenario of flying planes into buildings-and partic. Murad's talk of flying a plane into CIA HQ-I had Matt pull the unclass. Airman checks that we did to check on Murad's assoc. and the fact that we briefed the carriers on our investigation-I will look at what he pulled.

Also, Dave is going to have to go over the lack of information sharing with you ON DIRECT EXAMINATION-to blunt the blow of having the defense raise it for the first time on cross, thus weakening your credibility-and I'm speaking specifically of the following issues: 1. the Phoenix Memo-no, we did not get it, but if we had, this is what we would have done, just as we did when we got the Moussaoui info. -no, we did not know that DCI Tenet was being briefed on Moussaoui re "Islamic Fundamentalist Learns to Fly" , but it doesn't matter, because we did get the information, we were following up on it, and he was in custody at the time, so we knew he himself posed no immediate threat to aviation-the question will be raised did you have any reason to believe that M. was part of a conspiracy? Did you think about this? Did you do anything about this? How did you follow up on this?

In other words, the defense will exploit the fact that the FAA was not clued in to what was going on-you need to assert that we did not necessarily need to wait until we got all available information, that we acted independently, indeed, we had a statutory mandate, to follow up on any issue that we thought was a threat to civil aviation, regardless of whether the IC had any information to share on the subject or not.

-----Original Message-----
From: ██████████████████████
Sent: Wednesday, March 08, 2006 10:44 AM
To: Carla Martin
Subject: Re: Moussaoui Transcripts

Ok. Incredible -- 3 lengthy assessments whittled down to 2 pages. The best way to get it here is probably to fax it since it's only 2 Pages. Our fax number is ██████████.

FW: Moussaoui Transcripts                                                    Page 2 of 5

----- Original Message -----
From: "Martin, Carla <TSA OCC>" [█████████████]
Sent: 03/08/2006 10:29 AM
To: █████████████████████
Subject: RE: Moussaoui Transcripts

Yes, I have it-it's 2 pages-and I had Matt review it.

    -----Original Message-----
    From: ████████████ ███████████████
    Sent: Wed 3/8/2006 10:01 AM
    To: ██████████████████████████
    Cc:
    Subject: RE: Moussaoui Transcripts

OK. Thanks . Do you know what the status of the substitution is. today is already Wednesday and they supposedly were to have it done by Monday evening.



| | | |
|---|---|---|
| "Martin, Carla<br><TSA OCC>" | | |
| | To | ████████████████████ |
| 03/07/2006 04:37<br>PM | cc | ████████████████████ |
| | Subject | |
| | RE: Moussaoui Transcripts | |

Also, Claudio-the FBI agent today got tripped up when questioned about flying airplanes into buildings-he said that no one, before 9/11 "had ever thought about flying airplanes into buildings."  The defense countered with Murad re the plane and CIA.  I've asked Matt to pull any unclass. Information on Murad-as I know we ran down this issue, deemed it not to be credible, and ran names through the airman registry, those

3/12/2006

names of other indiv. assoc. with Murad.  Dave will need to go over that
with you.

-----Original Message-----
From: Martin, Carla <TSA OCC> [███████████████████]
Sent: Tuesday, March 07, 2006 4:31 PM
To: Claudio.Manno█████████████
Cc: █████████████
Subject: RE: Moussaoui Transcripts

Yes-and here are some of the highlights I'm not too happy about:

"The FAA is responsible for commercial airline security in the United
States.  Where the FBI would be the offense looking for the plot, had
Moussaoui not lied, the FAA would be the defense."

That "CAPPS (the "computer assisted passenger preselection system"
(sic) would have been changed to look not for explosives but for small
knives and box cutters, and that would have prevented the terrorists
from getting on the plane and getting on the plane with the weapons they
used to turn those aircraft into weapons to kill Americans."

"It would have been a very straightforward effort for the FAA to keep
those hijackers and to keep anyone with a knife or a box cutter off a
plane."

        "Because the FAA before 9/11 was concerned about people
smuggling explosives in checked luggage onto planes.  They weren't
concerned at that point about people taking over a plane with a
primitive weapon."

        The defense, essentially responded by saying "what the Govt.
wants you to believe is only a dream, and its most seductive quality is
that we all wish it had come true, but it is only a dream."

-----Original Message-----
From: ████████████████████████████████
Sent: Tuesday, March 07, 2006 4:28 PM
To: Carla Martin
Cc: ████████████████
Subject: Re: Moussaoui Transcripts

Thanks Carla. We'll look at it. 119 pages -- did they really talk that
Long?

----- Original Message -----
From: "Martin, Carla <TSA OCC>" [▮▮▮▮▮▮▮▮▮▮▮▮▮
Sent: 03/07/2006 03:06 PM
To: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Cc: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Subject: FW: Moussaoui Transcripts

Lynne, Claudio-you need to read this transcript of the prosecutor's
opening statements-it is all about the FAA, and how it would have caught
the hijackers and prevented 9/11.

I believe there are more than a few errors here.

Carla

-----Original Message-----
From: Jeffrey Ellis [▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Sent: Tuesday, March 07, 2006 12:26 PM
To: Martin, Carla
Subject: Fw: Moussaoui Transcripts



------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: Christensen, Christopher R. ◄▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
To: Jeffrey Ellis ◄▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Sent: Tue Mar 07 10:27:17 2006
Subject: Fw: Moussaoui Transcripts

Y <<3-6-06 1.PDF>> ou may have had di <<3-6-06.1a.pdf>> fficulty opening
the prior version of the transcripts
------------------------
Sent from my BlackBerry Wireless Handheld (www.BlackBerry.net)

-----Original Message-----
From: Selinger, Maia L. ◄▮▮▮▮▮▮▮▮▮▮▮▮
To: Christensen, Christopher R. ◄▮▮▮▮▮▮▮▮▮▮▮
Sent: Tue Mar 07 10:24:52 2006
Subject: Moussaoui Transcripts

<<3-6-06 1.PDF>> <3-6-06 1.PDF>> <<3-6-06.1a.pdf>> <<3-6-06.1a.pdf>>

Maia Selinger
Legal Assistant
Condon and Forsyth LLP

3/12/2006

7 Times Square
New York, NY 10036

3/12/2006

## Novak, David (USAVAE)

| | |
|---|---|
| **From:** | Martin, Carla <TSA OCC> [] |
| **Sent:** | Saturday, March 11, 2006 6:27 PM |
| **To:** | Kerner, Francine |
| **Subject:** | FW: Moussaoui Transcripts |

-----Original Message-----
From: Martin, Carla <TSA OCC>
Sent: Tuesday, March 07, 2006 4:38 PM
To: ▓▓▓▓▓▓▓▓▓
Cc: ▓▓▓▓▓▓▓▓▓
Subject: RE: Moussaoui Transcripts

Also, Claudio-the FBI agent today got tripped up when questioned about flying airplanes into buildings-he said that no one, before 9/11 "had ever thought about flying airplanes into buildings." The defense countered with Murad re the plane and CIA. I've asked Matt to pull any unclass. Information on Murad-as I know we ran down this issue, deemed it not to be credible, and ran names through the airman registry, those names of other indiv. assoc. with Murad. Dave will need to go over that with you.

-----Original Message-----
From: Martin, Carla <TSA OCC> 
Sent: Tuesday, March 07, 2006 4:31 PM
To: ▓▓▓▓▓▓▓▓▓
Cc: ▓▓▓▓▓▓▓
Subject: RE: Moussaoui Transcripts

Yes-and here are some of the highlights I'm not too happy about:

"The FAA is responsible for commercial airline security in the United States. Where the FBI would be the offense looking for the plot, had Moussaoui not lied, the FAA would be the defense."

That "CAPPS (the "computer assisted passenger preselection system"
(sic) would have been changed to look not for explosives but for small knives and box cutters, and that would have prevented the terrorists from getting on the plane and getting on the plane with the weapons they used to turn those aircraft into weapons to kill Americans."

"It would have been a very straightforward effort for the FAA to keep those hijackers and to keep anyone with a knife or a box cutter off a plane."

"Because the FAA before 9/11 was concerned about people smuggling explosives in checked luggage onto planes. They weren't concerned at that point about people taking over a plane with a primitive weapon."

The defense, essentially responded by saying "what the Govt. wants you to believe is only a dream, and its most seductive quality is that we all wish it had come true, but it is only a dream."

-----Original Message-----
From: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
Sent: Tuesday, March 07, 2006 4:28 PM
To: Carla Martin
Cc: ▓▓▓▓▓▓▓▓▓▓▓
Subject: Re: Moussaoui Transcripts


Thanks Carla. We'll look at it. 119 pages -- did they really talk that Long?



-----Original Message-----
From: "Martin, Carla <TSA OCC>" ▓▓▓▓▓▓▓▓▓▓▓▓▓
Sent: 03/07/2006 03:06 PM
To: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
Cc: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
Subject: FW: Moussaoui Transcripts

Lynne, Claudio-you need to read this transcript of the prosecutor's opening statements-it is all about the FAA, and how it
would have caught the hijackers and prevented 9/11.

I believe there are more than a few errors here.

Carla

-----Original Message-----
From: Jeffrey Ellis ▓▓▓▓▓▓▓▓▓▓▓▓▓▓
Sent: Tuesday, March 07, 2006 12:26 PM
To: Martin, Carla
Subject: Fw: Moussaoui Transcripts




--------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: Christensen, Christopher R. ◄▓▓▓▓▓▓▓▓▓▓▓▓▓
To: Jeffrey Ellis <▓▓▓▓▓▓▓▓
Sent: Tue Mar 07 10:27:17 2006
Subject: Fw: Moussaoui Transcripts

Y <<3-6-06 1.PDF>> ou may have had di <<3-6-06.1a.pdf>> fficulty opening the prior version of the transcripts
--------------------------
Sent from my BlackBerry Wireless Handheld (www.BlackBerry.net)



-----Original Message-----

From: Selinger, Maia L. ████████████████
To: Christensen, Christopher R. ████████████
Sent: Tue Mar 07 10:24:52 2006
Subject: Moussaoui Transcripts

< <<3-6-06 1.PDF>> <3-6-06 1.PDF>>  <<3-6-06.1a.pdf>> <<3-6-06.1a.pdf>>


Maia Selinger
Legal Assistant
Condon and Forsyth LLP
7 Times Square
New York, NY 10036
██████████████

Exhibit 18

# DEBEVOISE & PLIMPTON LLP

919 Third Avenue
New York, NY 10022
Tel  212 909 6000
www.debevoise.com

Roger E. Podesta
Partner
Tel  212 909 6213
Fax  212 909 6836
repodesta@debevoise.com

May 7, 2007

**By E-mail**

Jeannette A. Vargas, Esq.
Assistant United States Attorney
U.S. Department of Justice
Southern District of New York
86 Chambers Street, Third Floor
New York, NY  10007

**In Re September 11 Tort Litigation**
**21 MC 97, 21 MC 101 (AKH)**

Dear Jeannette:

This is in response to your April 26, 2007 letter to me conveying the request of the FAA and TSA that the Aviation Defendants provide (1) the names of all FAA or TSA employees or former employees that any of the Aviation Defendants intend to depose in connection with this litigation; (2) the topics to be covered at such depositions, if authorized; (3) the expected duration of any such depositions, if authorized; and (4) the scope of any additional requests for document discovery from the agencies.

Unfortunately, for the reasons set forth below, the Aviation Defendants are not in a position at this time to provide the degree of specificity that you request.  First, as you are aware, the Aviation Defendants' motions concerning the scope of government discovery and seeking determination of the applicable standard of care governing their conduct as of September 11, 2001 are in the process of being briefed and are scheduled for argument before Judge Hellerstein on June 14, 2007.  These motions will provide important guidance concerning the scope and subject matter of the discovery the Aviation Defendants will require from TSA and FAA.  Of course, the scope and extent of the discovery the Aviation Defendants will seek from TSA and FAA will undoubtedly be less, perhaps substantially less, if the Court determines that the federal aviation security regulations displace any competing state law standards and establish the outer limits of tort liability.  If, however, the Court determines that the plaintiffs are to be permitted to attempt to fashion common law standards for what aviation security procedures should have been on 9/11, the scope and extent of the requested discovery will be much broader. It will then become necessary, for example, for the Aviation Defendants not only to

Jeannette A. Vargas, Esq.                    2                        May 7, 2007

establish what the aviation security procedures were, but also the rationale and policies
underlying their adoption by the FAA and the FAA's consideration and rejection of
alternative approaches to security screening that plaintiffs choose to contend were
mandated by the common law.  In effect, the Aviation Defendants will be required to
conduct discovery to persuade the juries not only that they complied with FAA
requirements but that those requirements had a sound policy basis and were reasonable
measures that should be accepted by the juries as meeting the applicable common law
standard of care.  It is in large part for this reason that the Aviation Defendants consented
to adjourn the FAA Rule 30(b)(6) deposition initially noticed for May 2, 2007 until after
the June 14 hearing.

          Second, the FAA and TSA requests for additional specificity largely put the cart
before the horse.  The Aviation Defendants have tried, consistent with the protection of
their litigation interests, to avoid burdening TSA and FAA with multiple or conflicting
requests.  To that end, the Aviation Defendants as a group served a single set of
document requests on FAA and TSA in July 2006 and have several times modified and
prioritized that request in an effort to accommodate TSA and FAA.  To date, however,
we have received only a limited production of responsive documents, although we have
been assured that substantial numbers of additional documents potentially containing SSI
will be placed into the Reading Room.  As of this writing, however, not a single attorney
for any of the Aviation Defendants has been cleared for access to the Reading Room.
Without an opportunity to review the documents that TSA and FAA are producing in
response to our outstanding requests, the Aviation Defendants are simply unable to
identify what additional documents they may require.

          The situation is quite similar for depositions.  Once again, the Aviation
Defendants have avoided multiple or conflicting deposition requests and have provided
TSA and FAA with a very detailed Rule 30(b)(6) deposition notice.[*]  Indeed, we adopted
the Rule 30(b)(6) approach to FAA deposition discovery at the suggestion of the
Government in an effort potentially to limit the number of individual FAA and TSA
witness depositions we might seek.  But the Aviation Defendants have consistently
reserved their right to take additional FAA or TSA depositions if the designated Rule
30(b)(6) witness or witnesses are unable to meet all of our legitimate discovery needs.

          The Aviation Defendants have sought to cooperate with the Government in
addressing the difficult discovery issues presented by this important and complex
litigation and we in turn have appreciated the efforts of the Government, and particularly

---

[*]     MassPort's request for the depositions of Stephen Luongo and James Peters is
        consistent with the Aviation Defendants' approach.  Messrs. Luongo and Peters are
        in no sense Rule 30(b)(6) witnesses, but rather fact witnesses on a specific topic of
        peculiar importance to MassPort.

Jeannette A. Vargas, Esq.                    3                         May 7, 2007

of your office, to take account of our interests.  But until the Court rules on the pending
motions, until the documents already requested for production proceed through the
process of Reading Room review and until the Rule 30(b)(6) deposition is held, the
Aviation Defendants cannot provide, and cannot reasonably be expected to provide, the
type of detailed particulars for additional discovery that TSA and FAA request in your
letter.

                              Very truly yours,

                              Roger E. Podesta

Exhibit 19

Exhibit 19 has been filed in hard-copy format pursuant to ¶7.3 of the March 30, 2004 Confidentiality Order in this litigation.