UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                                            :
IN RE SEPTEMBER 11 LITIGATION                               :
                                                            :        21 MC 97 (AKH)
------------------------------------------------------------x        21 MC 101 (AKH)
                                                            :
IN RE SEPTEMBER 11 PROPERTY DAMAGE  :
AND BUSINESS LOSS LITIGATION                                :
                                                            :
------------------------------------------------------------x

**PLAINTIFFS' MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTIONS
<u>TO DETERMINE THE APPLICABLE STANDARD OF CARE</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ ii

PRELIMINARY STATEMENT .................................................................... 1

ARGUMENT ............................................................................................... 6

POINT I.     No "Mandatory Federal Security Blueprint" Will Be Disturbed By
             Application of Common Law Tort Principles in These Actions .................... 6

POINT II.    The Common Law Standard of Care Is Not Preempted by Federal Law ......... 15

    A.       No Express Preemption ........................................................... 15

    B.       No Implied Preemption ........................................................... 19

POINT III.   A Common Law Standard of Care Is Not Inconsistent with
             Federal Law ........................................................................ 24

POINT IV.    The Applicable Standard of Care Is Reasonableness Under the
             Circumstances ...................................................................... 29

    A.       Compliance with FAA Regulations, the ACSSPs,
             the ASPs and the COGs ........................................................... 30

    B.       Compliance with the Federal Statutory Duty to Provide Service
             With the Highest Possible Degree of Safety in the Public Interest .............. 31

    C.       The Duty to Take All Additional Steps That a Reasonably Prudent
             Person Would Take to Avoid Causing Harm ..................................... 32

CONCLUSION….. .................................................................................. 34

# TABLE OF AUTHORITIES

## CASES

*Abdullah v. American Airlines, Inc.*, 181 F.3d 363 (3d Cir. 1999) .................17, 21, 22-24, 30-31

*American Airlines, Inc. v. Wolens*, 513 U.S. 219 (1995).......................................................16, 17

*Avemco Insurance Co., Inc. v. Elliott Aviation Flight Services, Inc.*, 86 F. Supp. 2d 824 (C.D. Ill. 2000) ................................................................................................................. 31

*Bennett v. Southwest Airlines Co.*, No. 06-3486, 2007 WL 1215055 (7th Cir. Apr. 26, 2007) ............................................................................................................................... 3, 13

*Branche v. Airtran Airways, Inc.*, 342 F.3d 1248 (11th Cir. 2003) ........................................... 17

*California Coastal Commission v. Granite Rock Co.*, 480 U.S. 572 (1987).............................. 19

*Canada Life Assurance Co. v. Converium Ruckversicherung (Deutschland) AG*, 335 F.3d 52 (2d Cir. 2003) ................................................................................................................. 29

*Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259 (9th Cir. 1998) ...................................... 18

*City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624 (1973)...................................... 23

*Cleveland v. Piper Aircraft Corp.*, 985 F.2d 1438 (10th Cir. 1993) ............................... 20-21, 23

*Coalition to Defend Affirmative Action v. Granholm*, 473 F.3d 237 (6th Cir. 2006) ................. 25

*Coupe v. Federal Express Corp.*, 121 F.3d 1022, 1025 n.1 (6th Cir. 1997)............................... 32

*Di Benedetto v. Pan Am World Service, Inc.*, 359 F.3d 627 (2d Cir. 2004) .......................... 33-34

*Donkor v. British Airways, Corp.*, 62 F. Supp. 2d 963 (S.D.N.Y. 1999)..............................18 n.7

*Drake v. Laboratories Corp. of America*, 458 F.3d 48 (2d Cir. 2006)..................................22 n.8

*Ducombs v. Trans World Airlines*, 937 F. Supp. 897 (N.D. Cal. 1996)................................ 16-17

*FAA v. Landy*, 705 F.2d 624 (2d Cir. 1983) .......................................................................14, 32

*Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132 (1963)...................................... 19

*Gade v. National Solid Wastes Management Association*, 505 U.S. 88 (1992) ......................... 20

*Glavey v. Aer Lingus*, No. 98 Civ. 7003 (LAP), 1999 U.S. Dist. LEXIS 10498 (S.D.N.Y. July 6, 1999) ........................................................................................................18 n.7

*Hodges v. Delta Airlines, Inc.*, 44 F.3d 334 (5th Cir. 1995) ...........................................15, 17, 18

*Holliday v. Bell Helicopters Textron, Inc.*, 747 F. Supp. 1396 (D. Haw. 1990) ....................20, 22

*In re Air Crash Disaster at John F. Kennedy International Airport on June 24, 1975*, 635 F.2d 67 (2d Cir. 1980) ................................................. 5 n.2, 14, 21, 22-23, 32-33

*In re Air Disaster at Lockerbie Scotland*, 37 F.3d 804 (2d Cir. 1994) .......................13-14, 24 n.9

*In re September 11 Litig.*, 280 F. Supp. 2d 279 (S.D.N.Y. 2003) ................................................. 5-6

*In re TMI Litigation Cases Consolidated II*, 940 F.2d 832 (3d Cir. 1991) ...........................27, 28

*In re Trans World Airlines, Inc.*, FAA Order No. 1999-2, 1999 WL 1125387, at *3 (Aug. 23, 1999) ........................................................................................................31-32

*Japan Airlines Co. v. Port Auth. of N.Y. and N.J.*, 178 F.3d 103 (2d Cir. 1999) ...................32-33

*Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549 (D.C. Cir. 1993) ........................................... 32

*Margolis v. United Airlines, Inc.*, 811 F. Supp. 318 (E.D. Mich. 1993) ..............................18 n.7

*McNally v. Port Authority (In re WTC Disaster Site)*, 414 F.3d 352 (2d Cir. 2005) .................. 15

*Meinhold v. Trans World Airlines, Inc.*, 949 F. Supp. 758 (C.D. Cal. 1996) ........................18 n.7

*Mesa v. California*, 489 U.S. 121 (1989) ................................................................................... 27

*Metrophones Telecomms., Inc. v. Global Crossing Telecomms., Inc.*, 423 F.3d 1056 (9th Cir. 2005) .................................................................................................................. 25

*Monroe v. Cessna Aircraft Co.*, 417 F. Supp. 2d 824 (E.D. Tex. 2006) .... 19-20, 21-22, 24 n.9, 32

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) .........................................16, 18 n.7

*O'Brien v. Mass. Bay Transport Authority*, 162 F.3d 40 (1st Cir. 1998) ................................... 25

*O'Connor v. Commonwealth Edison Co.*, 13 F.3d 1090 (7th Cir. 1994) ................................... 27

*O'Hern v. Delta Airlines, Inc.*, 838 F. Supp. 1264 (N.D. Ill. 1993) ........................................... 20

*Ospina v. Trans World Airlines, Inc.*, 975 F.2d 35 (2d Cir. 1992) ........................................24 n.9

*Pacific Gas & Electric Co. v. State Energy Conservation & Dev. Comm'n*, 461 U.S. 190 (1983)..................................................................................................... 27-28

*Public Health Trust v. Lake Aircraft, Inc.*, 992 F.2d 291 (11th Cir. 1993) ................................ 20

*Ray v. Atlantic Richfield Co.*, 435 U.S. 151 (1978) ..............................................................14 n.5

*Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979) ........................................................................ 26

*Ruta v. Delta Airlines, Inc.*, 322 F. Supp. 2d 391 (S.D.N.Y. 2004)....................................18 n.7

*Sakellaridis v. Polar Air Cargo, Inc.*, 104 F. Supp. 2d 160 (E.D.N.Y. 2000)............................ 21

*Schneider v. Feinberg*, 345 F.3d 135 (2d Cir. 2003)..................................................................... 9

*Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238 (1984) ...............................................22, 23-24, 28

*Skidmore v. Delta Air Lines, Inc.*, No. 99-CV-2958-G, 2000 U.S. Dist. LEXIS 18587 (N.D. Tex. Dec. 15, 2000) ..................................................................................................... 21

*Skydive Factory, Inc. v. Me. Aviation Corp.*, 268 F. Supp. 2d 61 (D. Me. 2003)....................... 22

*Smith v. America West Airlines, Inc.*, 44 F.3d 344 (5th Cir. 1995).....................................17-18

*Somes v. United Airlines, Inc.*, 33 F. Supp. 2d 78 (D. Mass. 1999).....................................18 n.7

*Sprietsma v. Mercury Marine*, 537 U.S. 51 (2002).................................................................. 13

*Stagl v. Delta Air Lines, Inc.*, 849 F. Supp. 179 (E.D.N.Y. 1994), *rev'd on other grounds*, 52 F.3d 463 (2d Cir. 1995)................................................................................................18 n.7

*Stanford v. Kuwait Airways Corp.*, 89 F.3d 117 (2d Cir. 1996) ................................24 n.9, 32-33

*Sunbird Air Servs. v. Beech Aircraft Corp.*, 789 F. Supp. 360 (D. Kan. 1992).....................19, 34

*Trinidad v. American Airlines, Inc.*, 932 F. Supp. 521 (S.D.N.Y. 1996) ......................................................... 5 n.2, 15, 17, 21, 22-23, 28

*United States v. Eastern Air Lines, Inc.*, 792 F.2d 1560 (11th Cir. 1986)............................13, 30

*United States v. Locke*, 528 U.S. 1015 (1999) ........................................................ 14 n.5, 24 n.9

*United States v. Ozark Air Lines, Inc.*, 419 F. Supp. 795 (E.D. Mo. 1976)......................30, 31-32

*United States v. S.A. Empresa De Viacao (Varig Airlines)*, 467 U.S. 797(1984)..................30, 31

*Verlinden B.V. v. Central Bank of Nig.*, 461 U.S. 480 (1983) ................................................... 27

*Wardair Canada, Inc. v. Florida Dep't of Revenue*, 477 U.S. 1, 5-6 (1986) ............................ 22

*Western Air Lines v. Criswell*, 472 U.S. 400 (1985) ............................................................ 3, 14

*Williams v. Trans World Airlines*, 509 F.2d 942 (2nd Cir. 1975) .................................... 31 & n.10

*Witty v. Delta Air Lines, Inc.*, 366 F.3d 380 (5th Cir. 2004) .................................................. 24 n.9

*Zervigon v. Piedmont Aviation, Inc.*, 558 F. Supp. 1305 (S.D.N.Y. 1983) .................................. 33

## STATUTES

14 C.F.R. § 91.13 ....................................................................................................... 30-31

6 U.S.C. § 442 (2002) ...................................................................................................... 26

49 U.S.C § 40101 ........................................................................................ 1, 5, 15, 24, 26, 29

49 U.S.C. § 44701 ...................................................................................... 1, 2, 7, 19, 31

49 U.S.C. § 44702 ................................................................................................... 2, 31

Airline Deregulation Act of 1978, Pub. L. No. 95-504, 92 Stat. 1705 (Oct. 24, 1978) .......... 15-16

Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat.
    § 505 (1992) ............................................................................................................ 16

Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, 116 Stat. 2322 ........................... 26

Public Readiness and Emergency Preparedness Act, 42 U.S.C. § 247d-6d (2005) ..................... 26

Price-Anderson Amendments Act of 1988, Pub. L. No. 100-408, 102 Stat. 1066 (1988) ........... 27

## OTHER MATERIALS

148 CONG. REC. H8803 (2002) ...................................................................................... 26-27

RESTATEMENT (SECOND) OF TORTS § 288C (2006) ................................................................. 3

# Preliminary Statement[1]

Plaintiffs' traditional state law causes of action for wrongful death, personal injury and property damage on account of the September 11 catastrophe were federalized by Section 408 of the Air Transportation Safety and System Stabilization Act, Pub. L. No. 107-42, 115 Stat. 230 (2001) (codified, as amended, at 49 U.S.C. § 40101 note) (the "ATSSSA"). In federalizing Plaintiffs' causes of action, however, Congress mandated that state law "shall" provide the substantive law for decision unless it is inconsistent with or otherwise preempted by federal law. Section 408(b)(2) of the ATSSSA states:

> SUBSTANTIVE LAW. The substantive law for decision [in the 9/11 cases] shall be derived from the law, including choice of law principles, of the State in which the crash occurred unless such law is inconsistent with or preempted by Federal law.

There is simply no conflict or inconsistency between the traditional state common law standard that applies in these 9/11 cases and the federal aviation statutes and regulations in effect on 9/11. By their express terms, the federal aviation statutes and regulations established only baseline or "minimum standards." *See, e.g.,* 49 U.S.C. § 44701(a)(1), (2), (5) and (b). A "minimum standard" is not a maximum or exclusive standard. Industry participants were not only free to exceed the minimum standards but were affirmatively required to do so, consistent

---

[1] This Memorandum is submitted by the Personal Injury and Wrongful Death Plaintiffs, Property Damage and Business Loss Plaintiffs, and World Trade Center Properties Cross-Claim Plaintiffs (collectively, "Plaintiffs"). This Memorandum responds to the memoranda filed in support of the Aviation Defendants' Motion for Determination of Applicable Law Regarding the Standard of Care ("AD Mem."); United Air Lines, Inc. and UAL Corporation's Motion for Determination of Applicable Law, Dismissal of All Punitive Damage Claims and for Certain Government Discovery ("United Mem."); Airport Operators' Motion for Determination of Applicable Law Regarding the Standard of Care ("AO Mem."); and The Boeing Company's Motion for Determination of Applicable Law ("Boeing Mem."). Moving Defendants are referred to as "Aviation Defendants" or "Defendants." Emphasis is added and internal citations are omitted throughout this Memorandum. Abbreviations used in the Defendants' memoranda are adopted in this Memorandum, except as noted. The accompanying Plaintiffs' Declaration is cited as "Plaintiffs' Dec."

with the air carriers' statutory duty to "provide service with the <u>highest possible degree of safety in the public interest</u>." *See* 49 U.S.C. § 44701(d)(1)(A). *See also* 49 U.S.C. § 44702(b)(1)(A). The statutory duty itself requires application of a reasonableness standard. Mere compliance with "minimum standards" — even assuming there was compliance, and Plaintiffs will prove there was not — cannot and does not excuse the Defendants' negligent failure to exercise that high degree of care reasonably required to deal competently and effectively with the known risk of harm leading up to the tragedy of 9/11.

This common-sense, established interpretation of applicable law is precisely how the Aviation Defendants themselves understood their obligations on and before 9/11, as evidenced, for example, by the numerous briefs they filed throughout the country (*see* Plaintiffs' Dec. Exhs. 2, 5-8), including an *amicus* brief filed in the United States Supreme Court on June 1, 2000 by the Air Transport Association of America ("ATA"), the trade organization that represents all major U.S. air carriers, including American Airlines, United Airlines and US Airways. In its brief, the ATA recognized the "explicit and unambiguous statutory command that obligates all air carriers to operate with the 'highest possible degree of safety in the public interest'" and explained to the Supreme Court that:

> [T]he FAA relies on the fact that commercial airlines will impose even more stringent standards than does the agency for the most safety sensitive jobs. The Federal Aviation Act distinguishes expressly between the air carriers' obligation to maintain the *highest* standard, and the FAA's lesser obligation to set "*minimum*" standards…. <u>Federal courts have recognized that the Federal Aviation Act expects air carriers to set standards higher than the minimums promulgated by the FAA</u>….
>
> <u>The FAA's minimum standards, then, offer no safe harbor for airlines in a given situation; their responsibilities for risk management are appreciably greater</u>.

Plaintiffs' Dec. Exh. 2, Brief of Air Transport Ass'n of Am., *et al.* as *Amici Curiae* Supporting Petitioner in *Eastern Associated Coal Corp. v. United Mine Workers*, 531 U.S. 57 (2000) (No.

99-1038), 2000 WL 719555, at *2, 17-18 (the "ATA Brief") (*citing Western Air Lines v. Criswell*, 472 U.S. 400, 419-20 (1985)) (underlining added, italics in original).

As Defendants acknowledged in the ATA Brief, federal requirements obliged them to make choices in carrying out their responsibilities.  The standard of care used by courts to determine whether the choices made were the correct choices is the "context sensitive" common law standard of reasonableness under the circumstances.  *See Bennett v. Southwest Airlines Co.*, No. 06-3486, 2007 WL 1215055, at *5 (7th Cir. Apr. 26, 2007) ("Appeals to 'uniform national rules' do not explain" how to apply such rules to the circumstances of a particular case.  Such translation "is governed by context-sensitive doctrines such as the law of negligence.").

Accordingly, courts apply the traditional common law standard of reasonableness under the circumstances not only to determine whether specific federal regulations were breached, but also to determine when more is required than mere compliance with existing federal safety and security regulations.  "Compliance with a legislative enactment or an administrative regulation does not prevent a finding of negligence where a reasonable man would take additional precautions."  RESTATEMENT (SECOND) OF TORTS § 288C (2006).

The position articulated by the Aviation Defendants in the ATA Brief in 2000 flatly contradicts the position they take before this Court, but it is entirely consistent with the position they took in scores of pre-9/11 documents and statements, as discussed below and in the accompanying Plaintiffs' Declaration.  It is also entirely consistent with the position of the FAA on and before September 11, 2001.

Tellingly, on the morning of 9/11, as the terrorists were passing through the checkpoints with deadly weapons and were preparing to board and hijack the 9/11 flights, the FAA's website prominently displayed the following on its "Frequently Asked Questions" page:

**Q.  Can an airline exceed minimum FAA requirements?**

A.  <u>Yes.  The FAA sets minimum requirements for airlines to follow.</u>
Should airlines wish to exceed these requirements, the FAA cannot
prohibit them from doing so.
***

**Q.  Why can I carry the same item through one passenger screening
checkpoint and not through others?**

A.  <u>Some airlines and airports have stricter interpretations of deadly and
dangerous items.  What one airline will allow other airlines will not</u>.

**Q.  What items are prohibited beyond the passenger screening
checkpoint?**

A.  The FAA prohibits airlines from allowing dangerous or deadly items
through the passenger screening checkpoint.  <u>Because of the subjective
determination of dangerous and deadly items, it is the airline's
responsibility to determine what they will allow</u>.  Most airlines will
prohibit items such as scissors, trade tools, and items resembling firearms.

Plaintiffs' Dec. Exh. 19.

The Checkpoint Operations Guide ("COG"), which was developed by the aviation

industry to provide guidelines for use at security checkpoints, also recognized that airlines may

direct the use of intensified security procedures based on intelligence developed by the airline's

security department, in addition to procedures that may be directed by the FAA.  COG § 6-1,

Plaintiffs' Dec. Exh. 10.  Both the Air Carrier Standard Security Program ("ACSSP") and the

COG — the two documents that the Aviation Defendants point to as "uniform inviolate"

mandates — repeatedly required the Defendants to exercise good judgment and reasonable care

to meet their safety and security responsibilities in terms entirely consistent with the common

law as articulated in state court jurisprudence.  *See, e.g.,* Plaintiffs' Dec. Exhs. 10-11.  The

Massachusetts Airport Security Program ("ASP") similarly contemplated that the Aviation

Defendants would increase security measures based on their own assessments of the threats

posed.  Plaintiffs' Dec. Exh. 9.

4

These documents, dozens of others discussed below and in the Plaintiffs' Declaration, the text of the ATSSSA, and the governing case law in this Circuit,[2] vitiate the Aviation Defendants' contention that federal law did not set "minimum standards" (as it explicitly said it did) but, rather, "mandatory, inviolate requirements" that the Defendants could not, and were not required to, exceed. AD Mem. at 6-7. Incongruously, the Defendants contend that statutory language which expressly provides for application of state substantive law actually means that no state substantive law may be applied. They urge that federal statutes which expressly — and repeatedly — state that they set forth "minimum standards" instead set forth maximum and exclusive standards. These arguments do not withstand analysis and are irreconcilable with Defendants' pre-9/11 admissions.

It is now well-established, and Plaintiffs will prove, that aviation security provided by the Defendants on 9/11 was a mockery by whatever standard it is measured. The federal minimum standards — behind which the Defendants now seek to take refuge — do not insulate them from liability. The Defendants were obligated to act reasonably under the circumstances and to exercise that highest degree of care necessary to deal with the terror threats directed to civil aviation before 9/11 that were known or knowable to Defendants. No federal statute or regulation preempts the Defendants' obligation to exercise reasonable care under the circumstances. As this Court has observed, "[o]urs is a complicated and specialized society. We depend on others charged with special duties to . . . enable us to travel with a sense of security . . . to protect us from the willful desire of terrorists to do us harm." *In re September 11 Litig.*, 280 F. Supp. 2d 279, 292-93 (S.D.N.Y. 2003). The Defendants failed to honor their duty.

---

[2]    *See, e.g., In re Air Crash Disaster at John F. Kennedy Int'l Airport on June 24, 1975*, 635 F.2d 67, 74-75 (2d Cir. 1980); *Trinidad v. American Airlines, Inc.*, 932 F. Supp. 521 (S.D.N.Y. 1996).

## ARGUMENT

### POINT I

### No "Mandatory Federal Security Blueprint" Will Be Disturbed By Application of Common Law Tort Principles In These Actions

Defendants argue that FAA requirements are not "mere minimum standards," but rather "just the kind of mandatory, inviolate requirements that courts have classically considered to have preemptive force." AD Mem. at 7. Defendants' position is irreconcilable with the language of the Federal Aviation Act ("FAAct"), which provides, among other things, that:

(a) . . . The Administrator of the Federal Aviation Administration shall promote safe flight of civil aircraft in air commerce by prescribing—

    (1) <u>minimum standards</u> required in the interest of safety for appliances and for the design, material, construction, quality of work, and performance of aircraft, aircraft engines, and propellers;

    (2) regulations and <u>minimum standards</u> in the interest of safety for— (A) inspecting, servicing, and overhauling aircraft, aircraft engines, propellers, and appliances; . . .

    (5) regulations and <u>minimum standards</u> for other practices, methods, and procedure the Administrator finds necessary for safety in air commerce and national security.

(b) Prescribing minimum safety standards. The Administrator may prescribe <u>minimum safety standards</u> for—

    (1) an air carrier to whom a certificate is issued under section 44705 of this title [49 U.S.C. § 44705]; and

    (2) operating an airport serving any passenger operation of air carrier aircraft designed for at least 31 passenger seats.

        ***

(d) . . . When prescribing a regulation or standard under subsection (a) or (b) of this section . . ., the Administrator shall—

    (1) consider—

        (A) <u>the duty of an air carrier to provide service with the highest possible degree of safety in the public interest</u> . . .

49 U.S.C. § 44701.

6

The FAA Handbooks establish the paramount obligation of "private sector" actors like the Aviation Defendants to treat FAA standards and rules as a floor on which to ground methods to fulfill their duty to "provide service with the highest possible degree of safety":

> The FAA, which represents part of the "public sector", has the duty . . . to establish minimum standards, rules, and national policies to provide adequately for national security and safety in air commerce. <u>This responsibility for aviation safety, however, does not rest entirely with the FAA.</u>  <u>Persons or organizations of the "private sector" are also obligated to provide for public safety.</u> . . .
>
> Title 49 charges the FAA with the responsibility for promulgating and enforcing adequate standards and regulations.  At the same time, <u>Title 49 recognizes that the holders of air carrier certificates have a direct responsibility for providing air transportation with the **highest possible degree of safety**</u>.  <u>The meaning of Title 49, § 44702(b), should be clearly understood.  It means that this responsibility rests directly with the air carrier, irrespective of any action taken or not taken by an FAA inspector or the FAA.</u>

FAA Handbook 8400.10 CHG 10, at 1-59 (Dec. 20, 1994), Plaintiffs' Dec. Exh. 4.  *See also, e.g.,* FAA Handbook 8300.10; FAA Handbook 8700.1, Plaintiffs' Dec. Exh. 8.

Equally lacking in candor is Defendants' assertion that "[a]ir carriers and their agents were simply not free to substitute their own judgment for that of the FAA and the FBI as to the nature and severity of the threats facing civil aviation and disregard mandatory countermeasures in favor of different priorities."  AD Mem. at 3.  The FAA and Aviation Defendants' own documents incontrovertibly refute this.  Senior FAA civil aviation security officials stated in public policy statements prior to September 11, for example, that:

> Security countermeasures issued by the FAA in a Security Directive establish security minimums for adoption by airlines and airports.  <u>Airlines and airports may exceed those minimum standards by implementing more stringent security requirements.</u>  Where airlines implement additional or more stringent measures, passengers may sometimes experience differences in procedures as they undergo processing.  Refusal to allow a passenger without a photo identification to board the aircraft is an example of such differences, and is the policy of an individual airline; this is not an FAA security requirement.

March 13, 1996 letter from Cathal L. Flynn, FAA Associate Administrator for Civil Aviation

Security, Plaintiffs' Dec. Exh. 12.

     Other FAA policy statements similarly make it clear that, while the FAA "provides

guidelines for air carriers to determine what may constitute a deadly or dangerous weapon," the

carriers themselves had the "final decision to impose more stringent restrictions. . . ." July 2,

2001 letter from Michael A. Canavan, FAA Associate Administrator for Civil Aviation Security,

Plaintiffs' Dec. Exh. 14.  *See also* Slide Presentation of Annmarie Avilla, FAA Principal

Security Inspector for U.S. Airways, *Roles and Responsibilities of the Principal Security

Inspector*, Plaintiffs' Dec. Exh. 25 ("U.S. Air Carriers must follow the Air Carrier Standard

Security Program (ACSSP) Requirements . . .  US Airways may go above and beyond the

requirements.").

     As noted above in the Preliminary Statement, the FAA prominently displayed the

following on its website on and before 9/11 making clear that the security obligations imposed

by federal regulations did not preclude the application of a reasonableness standard in evaluating

the Defendants' conduct:

> **Q.  Can an airline exceed minimum FAA requirements?**
>
> A.  Yes.  The FAA sets minimum requirements for airlines to follow.
> Should airlines wish to exceed these requirements, the FAA cannot
> prohibit them from doing so.
>                                   ***
>
> **Q.  Why can I carry the same item through one passenger screening
> checkpoint and not through others?**
>
> A.  Some airlines and airports have stricter interpretations of deadly and
> dangerous items.  What one airline will allow other airlines will not.
>
> **Q.  What items are prohibited beyond the passenger screening
> checkpoint?**
>
> A.  The FAA prohibits airlines from allowing dangerous or deadly items
> through the passenger screening checkpoint.  Because of the subjective

<u>determination of dangerous and deadly items, it is the airline's
responsibility to determine what they will allow</u>.   Most airlines will
prohibit items such as scissors, trade tools, and items resembling firearms.

Plaintiffs' Dec. Exh. 19.

For the Court's convenience, rather than elongate this brief extensively, Plaintiffs

separately submit numerous other, similar statements of the FAA and the Aviation Defendants as

exhibits to Plaintiffs' Minimum Standards Chart.  *See* Plaintiffs' Dec. Exh. 1.  These FAA policy

manuals, policy statements and interpretations of FAA regulations are entitled to respect and

deference.  *Schneider v. Feinberg*, 345 F.3d 135, 143 (2d Cir. 2003) ("Interpretive guidelines

that lack the force of law but nevertheless 'bring the benefit of an agency's specialized

experience to bear' on the meaning of a statute, are still entitled to 'some deference.'") (citations

and internal brackets omitted).

The FAA-approved Air Carrier Standard Security Programs, Checkpoint Operations

Guides and Airport Security Programs provide numerous concrete examples of the ways in

which Defendants were expected to exercise their own judgment to exceed minimum standards:

- "Some situations do not lend themselves to specific procedures.  Screeners, supervisors <u>and managers must keep in mind that some day-to-day situations will occur that require on-site decisions</u>.  NO ACTION should ever be taken that could compromise the aviation security process."  COG Preface, Plaintiffs' Dec. Exh. 10.

- <u>Guidelines To Determine Whether A Small-Bladed Knife Constitutes a Prohibited Weapon</u>:  "In some cases it may be difficult for screeners and/or supervisors to make a clear-cut determination as to the category of a specific item . . . <u>some knives with blades **under** 4 inches could be considered by a reasonable person to be a 'menacing knife'</u> and/or may be <u>illegal under local law</u> and should not be allowed to enter the sterile area."  COG § 5-7, Plaintiffs' Dec. Exh. 10.

- <u>Guidelines To Determine Whether Any Item Should Constitute A Prohibited Weapon</u>:  "The following guidelines are furnished to assist in making a reasonable determination of what property in the possession of a person should be considered a deadly or dangerous weapon.  <u>They are only guidelines, however, and common sense should always prevail. . . . Of course,</u>

the best guideline of all is common sense and caution. . . . In the whole approach to the screening process, good judgment should prevail.  For example, a pair of dressmaker scissors with other items indicating a hobby of sewing carried by a lady would probably result in a decision permitting her to carry the scissors.  The same scissors carried by a man or without sewing items might be reason to restrict carriage.  Other devices or objects not commonly thought of as a dangerous object, *e.g.*, tools, knitting needles, elongated scissors, and the like, when carried by an individual who does not obviously have a need for such items, may be questionable or may be treated as dangerous objects."  ACSSP Appendix I, II.1.a., Plaintiffs' Dec. Exh. 11.

- Minimum Staffing at Checkpoints:  "[D]uring peak periods of checkpoint screening activity, efficient screening may necessitate a staffing level which exceeds the minimum."  ACSSP § IIB, Plaintiffs' Dec. Exh. 11.

- The FAA *or* Logan International Airport and affected airlines will determine when increased security measures are necessary in response to recognized threat conditions or situations and will identify the appropriate threat level.  Massport ASP § V-1, Plaintiffs' Dec. Exh. 9.

- "The airline GSC [Ground Security Coordinator] may direct the use of intensified security procedures.  This is most often due to a security information circular or security directive issued to the airline by the FAA or intelligence developed by the airline security department."  COG § 6-1, Plaintiffs' Dec. Exh. 10.

Defendants' documents and testimony further confirm that the procedures set forth in the FAA regulations, ACSSPs, COGs, ASPs and elsewhere, set bare minimum standards that the Defendants knew they had the authority, right and responsibility to exceed.  Among other things, documents produced by Defendants in discovery confirm that state and local laws supersede federal regulations to the extent that the state and local laws provide stricter security measures than the federal minimum standards.

Excerpts from some of the documents produced by US Airways are illustrative:

➢ **Portland Screening Agreement**, Plaintiffs' Dec. Exh. 20:

2.1  **Definition of Service.**  [Pre-departure screening ("PDS")] services will be defined as and include the following:

2.1.1   PDS services as required by, <u>but not limited to</u>, those services mandated by the Air Carrier Standard Security Program (ACSSP) and the Checkpoint Operations Guide (COG).

2.1.2   Assure that all PDS services shall be in strict accordance with, <u>but not limited to</u>, the <u>guidelines</u>, <u>policies</u> and <u>procedures</u> outlined in the ACSSP and the COG.

2.1.3   <u>US Air reserves the right to require Globe to implement additional security measures that are above and beyond the minimum requirements detailed in the ACSSP and COG</u>. Globe may, with USAir's consent, increase its fees by an amount equal to Globe's increased costs associated with such additional security measures . . . .

➢ **US Airways Training Materials**, Plaintiffs' Dec Exh. 26 and 28.[3]

- "<u>The ACSSP manual establishes base line security measures</u>. These measures are the <u>minimum</u> requirements necessary for each carrier. <u>Each carrier may implement more restrictive measures when deemed necessary</u>."

- "Each airport must have an ASP Airport Security Plan. <u>It may contain state and local procedures that are airport specific</u>."

- "When it comes to safety and compliance issues, less than 100 percent is unacceptable***. <u>In some stations, state or county regulations supersede the federal mandates because they are more restrictive. You ensure compliance when you follow the most restrictive regulation</u>."

- U.S. Airways tested their employees on their understanding of this concept with the following multiple choice question (the correct answer is A)[4]:

---

[3]   US Airways *Ground Security Coordinator Initial Training* at US 2424, 2426; US Airways *Compliance 2000* Training at US 2661-62.

[4]   *See* Plaintiffs' Dec. at ¶ 28.

> MULTIPLE CHOICE.  PLEASE ANSWER A, B, C, OR D.
> ------------------------------------------------------------------------
> 3.      IF A STATE OR COUNTY REGULATION IS MORE
> RESTRICTIVE THAN THE FEDERAL MANDATE, WHICH
> DO YOU FOLLOW?
>
> **A.  THE MOST RESTRICTIVE REGULATION**
>
> B.  THE LEAST RESTRICTIVE REGULATION
>
> C.  THE FEDERAL REGULATION SUPERSEDES THE
>     LOCAL.
>
> D.  NONE OF THE ABOVE

Representatives of the Defendants have repeatedly echoed these published policies in public statements.  *See, e.g.*, Sara Olkon, *More American Travelers Endure Checks as Flight Security Tightens*, WALL ST. J., Sept. 18, 1995, at A13, Plaintiffs' Dec. Exh. 55 ("'We have the ability to impose additional security as we feel it is necessary,' said Joe Hopkins, a spokesman for United.  Air carriers say they routinely beef up security measures in response to terrorist threats."); National Tour Association, *United Airlines to Add Cockpit Security*, Sept. 3, 2004, Plaintiffs' Dec. Exh. 62 ("'We've always been intent on taking security an extra step with a secondary barrier to prevent unauthorized access to the cockpit and protect passengers and crew members from potential harm,' United spokesman Jeff Green said."); Cliff Edwards, *United Airlines Imposes Tight Security*, PHILA. INQUIRER, July 24, 1996, at A18, Plaintiffs' Dec. Exh. 47 ("'United Airlines has voluntarily imposed strict new safety measures in reaction to the TWA disaster…. The new measures were being imposed without any orders from the Federal Aviation Administration,' UAL President John Edwardson said yesterday."); Presentation of Massport Public Safety Director Joseph Lawless (MP 103460), Plaintiffs' Dec. Exh. 48 ("Meeting Minimum Requirements. . . . Federal government sets minimum standards . . . local authorities decide whether to exceed standards.").

Scores of similar admissions, which flatly contradict the position taken by the Defendants in their briefs, are set forth in Plaintiffs' Minimum Standards Chart, attached as Exhibit 1 to the Plaintiffs' Declaration.

Defendants cite snippets of an American Airline's ACSSP to make the point that uniformity is a key policy goal that would be compromised by a plethora of standards keyed to specific facts. AD Mem. 6-16. But, as the Seventh Circuit recently recognized, "[a]ppeals to 'uniform national rules' do not explain" how to apply such rules to the circumstances of a particular case. Such translation "is governed by context-sensitive doctrines such as the law of negligence." *Bennett v. Southwest Airlines Co.*, 2007 WL 1215055, at *5. *See also*, *e.g.*, *United States v. Eastern Air Lines, Inc.*, 792 F.2d 1560, 1563 (11th Cir. 1986) ("It would be potentially disabling to impose upon the FAA a requirement to draft regulations that describe in detail the many possible variations that threats to safety may take in a changing world. . . . In the context of air safety regulation, the need is to promulgate a general requirement, the meaning of which may evolve in response to changing circumstances and the exigencies of threats to safety."); *cf. Sprietsma v. Mercury Marine*, 537 U.S. 51, 70 (2002) ("the concern with uniformity does not justify the displacement of state common-law remedies that compensate accident victims and their families and that serve the Act's more prominent objective, emphasized by its title, of promoting boating safety").

Emphatically, it is a matter of law in this Circuit that compliance with FAA regulations does not, in and of itself, establish due care.

> Although the FAA regulations occupy a key role in the trial of this case, it must be kept in mind that Pan Am and Alert's compliance with them is not dispositive of the outcome. As . . . the court instructed the jury, proof of full compliance with the ACSSP would not necessarily provide appellants with a complete defense against a claim of willful misconduct. FAA regulations only establish minimum requirements for air carriers. A jury could conceivably find certain circumstances

13

under which an air carrier had committed willful misconduct even though it followed FAA regulations to the letter.

*In re Air Disaster at Lockerbie Scotland*, 37 F.3d 804, 815 (2d Cir. 1994) ("*Lockerbie*").  *See also FAA v. Landy*, 705 F.2d 624, 636 (2d Cir. 1983) ("[t]he Federal Aviation Act requires carriers 'to perform . . . services with the highest degree of safety' . . . [t]he regulations outline minimum standards of safety."); *In re Air Crash Disaster at John F. Kennedy Int'l Airport on June 24, 1975*, 635 F.2d at 74-75 ("regulations do prescribe minimum standards of safety," but the duty of an air carrier is "to use all reasonable means and information to avoid a crash" including using one's "own eyes and ears to offset obvious negligence by another.").[5]

Even Defendants themselves argued, in a brief to the United States Supreme Court in 2000, against the regulatory safe harbor they now seek in this Court:  "The FAA's minimum standards, then, offer no safe harbor for airlines in a given situation; their responsibilities for risk management are appreciably greater."  ATA Brief, 2000 WL 71955 at *18-19 (citing *Western Air Lines v. Criswell*, 472 U.S. 400, 419-20 (1985)).[6]

---

[5]    Boeing cites *United States v. Locke*, 528 U.S. 1015 (1999) and *Ray v. Atlantic Richfield Co.,* 435 U.S. 151 (1978) in an attempt to establish that the FAA regulations are not minimum standards.  Boeing Mem. at 20.  Both cases are inapposite, as they involved the regulation of oil tanker vessels, not aviation.  *Locke* and *Ray* thus did not address the FAAct, caselaw or authoritative FAA guidance that the FAA regulations are, as the statute clearly recites, "minimum standards."  Nor did they address the case law that applies the state standard of care to adjudicate *aviation* safety tort claims.  Nor did they address the FAA Handbook and other authoritative FAA guidance that outlines the statutorily recognized independent duties of private sector participants in the aviation field to act with the "highest possible degree of safety."

[6]    The ATA, a trade organization for 14 commercial airlines and Boeing, and the Regional Airline Association, whose 60 airline members transport 97 percent of regional airline passengers, submitted the *amici curiae* brief on behalf of, *inter alia*, American Airlines, Continental Airlines, Delta Air Lines, United Airlines, and US Airways.  ATA Brief at *2. Defendants argued that it was "irrelevant" that an airline's medical criteria for reinstating a pilot exceed the FAA's minimum requirements because "[a]n airline is free to impose more stringent requirements, and 'must be accorded great leeway and discretion in determining the manner in which it may be operated *most safely.'"  Id.*

POINT II

**The Common Law Standard of Care Is Not Preempted By Federal Law**

The Second Circuit has definitively held that "[w]hat ATSSSA itself displaces is not the substantive standards governing liability, but only the state-law damages remedies." *McNally v. Port Auth. (In re WTC Disaster Site)*, 414 F.3d 352, 379-80 (2d Cir. 2005).  This ruling is not only a correct, and binding, interpretation of the ATSSSA; it is also entirely consistent with decades of jurisprudence concerning federal preemption in the area of aviation regulation.

A.      **No Express Preemption**

In an argument that no other Defendant joins, United contends that state common law standards are preempted "because the 1978 ADA expressly preempts the use of state law to impose additional requirements…" on Defendants.  United Mem. at 4.  This argument is contrary to governing Supreme Court jurisprudence and has been rejected by numerous courts, including this one.

The FAAct did not preempt state common law claims.  *Somes v. United Airlines, Inc.*, 33 F. Supp.2d 78, 82 (D. Mass. 1999) (Lasker, J.) (FAAct did not preempt state law personal injury actions).  *See also, e.g., Trinidad,* 932 F. Supp. at 524; *Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 335 (5th Cir. 1995) (en banc).  Rather, as originally promulgated, it contained a saving clause providing that "nothing contained in this Act shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies."  FAAct § 1106, Pub. L. No. 85-726, 72 Stat. 731, 798 (Aug. 23, 1958).  In 1978, Congress amended the FAAct by passing the ADA, an economic deregulation statute.  "To prevent the states from frustrating the goals of deregulation by establishing or maintaining economic regulations of their own," *Trinidad*, 932 F. Supp. at 524 (quoting *Hodges*, 44 F.3d at 335), Congress included in the ADA a provision that expressly preempts the states

15

from "enact[ing] or enforc[ing] any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any air carrier . . . ." ADA § 105(a)(1), Pub. L. No. 95-504, 92 Stat. 1705 (Oct. 24, 1978). The ADA did <u>not</u> alter or repeal the FAAct's savings clause, quoted above.

The Supreme Court has twice considered the express preemption provision of the ADA, both times holding that it preempted only "[s]tate enforcement actions having a connection with or reference to airline 'rates, routes, or services.'" *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992); *see also American Airlines, Inc. v. Wolens*, 513 U.S. 219 (1995). Both cases were confined to pure economic regulation and had nothing to do with personal injury or negligence.

In *Morales*, the Court struck down fare advertising provisions of the National Association of Attorneys General Air Travel Industry Enforcement Guidelines because "the obligations imposed by the guidelines would have a significant impact upon the airlines' ability to market their product, and hence a significant impact upon the fares they charge." *Morales*, 504 U.S. at 390. Similarly, in *Wolens*, the Court found that the ADA expressly preempted claims under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. § 505 (1992), concerning frequent flyer program modifications that devalued credits that members had already earned. The *Wolens* Court was explicitly concerned with the "potential for intrusive regulation of airline business practices inherent in state consumer protection." 513 U.S. at 227-28.

Courts interpreting the scope of ADA preemption, therefore, limit it to the area of economics and market activity. *See Ducombs v. Trans World Airlines*, 937 F. Supp. 897, 900 (N.D. Cal. 1996) ("The majority of circuits that have dealt with the issue . . . have . . . defined the

scope of 'services' narrowly, limiting preemption to activity that is based on economic decisions and that relates to the contractual features that are bargained for by passengers."); *Branche v. Airtran Airways, Inc.*, 342 F.3d 1248, 1258 (11th Cir. 2003) ("[T]he purpose of the ADA's pre-emption provision is to increase 'reliance on competitive market forces rather than pervasive federal regulation'" (*citing Hodges*, 44 F.3d at 335; *Wolens*, 513 U.S. at 228)).

This narrow realm of ADA preemption explicitly excludes safety regulation and negligence resulting in personal injury or property damage:

> Plainly [the ADA's] purpose is not served by interpreting the term "services" to include those aspects of airline operations that are not bargained-for by carriers and their passengers. . . . Unsurprisingly, airlines do not compete on the basis of likelihood of personal injury, *i.e.*, onboard safety, and as such it does not undermine the pro-competitive purpose of the ADA, as set forth in *Wolens*, . . . to permit states to regulate this aspect of air carrier operations.

*Branche*, 342 F.3d at 1259.

Consequently, courts routinely reject ADA preemption of claims involving personal injury, property damage, or other safety issues. In *Trinidad*, for example, a case arising from the same facts as *Abdullah v. American Airlines, Inc.*, 181 F.3d 363 (3d Cir. 1999), the Court addressed claims of personal injury arising from an aviation accident that occurred during turbulent weather:

> Plaintiffs' claims do not involve "ticketing, boarding, in-flight service and the like," . . . nor do the claims involve "implementation of airline 'policies,' such as those relating to 'bumping, denial of boarding, segregation of smoking passengers,' or discrimination" . . . . Rather, the claims are analogous to those of the many cases cited above. Accordingly, I find that Plaintiffs' claims are not expressly preempted by the ADA.

*Trinidad*, 932 F. Supp. at 526. *See also*, *e.g.*, *Smith v. America West Airlines, Inc.*, 44 F.3d 344, 347 (5th Cir. 1995) (en banc) (Claim of gross negligence in permitting hijacker to board: "[T]he real question, is the scope of 'services' that were deregulated: those services include boarding practices in their economic or contractual dimension but not insofar as the safety of the flight is

involved."); *Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259, 1266 (9th Cir. 1998) ("[W]hen Congress enacted federal economic deregulation of the airlines, it intended to insulate the industry from possible state economic regulation as well.  It intended to encourage the forces of competition.  It did not intend to immunize the airlines from liability for personal injuries caused by their tortious conduct."); *Hodges*, 44 F.3d at 338 ("[N]either the ADA nor its legislative history indicates that Congress intended to displace the application of state tort law to personal physical injury inflicted by aircraft operations, or that Congress even considered such preemption.").  Numerous other cases are in accord.[7]

---

[7]        *See also Ruta v. Delta Airlines, Inc.*, 322 F. Supp. 2d 391, 400-401 (S.D.N.Y. 2004) ("Because the flight crew's decision to have [plaintiff] arrested was allegedly motivated by spite or some unlawful purpose, [plaintiff's] subsequent tort claims arising out of this decision are at best tenuously related to an airline service."); *Donkor v. British Airways, Corp.*, 62 F. Supp. 2d 963, 972 (S.D.N.Y. 1999) ("[I]t is clear that claims that an airline or its personnel were negligent in the performance of their duties are not preempted by the Act."); *Glavey v. Aer Lingus*, No. 98 Civ. 7003 (LAP), 1999 U.S. Dist. LEXIS 10498, at *12-16 (S.D.N.Y. July 6, 1999) ("By forcing Glavey to write an apology to the airline, Aer Lingus is not providing a traditional 'service,' such as offering competitive prices to its customers or filling its flights to capacity."); *Stagl v. Delta Air Lines, Inc.*, 849 F. Supp. 179, 182-83 (E.D.N.Y. 1994), *rev'd on other grounds*, 52 F.3d 463 (2d Cir. 1995) ("The personal injury claim asserted by Ms. Stagl invokes only concepts of traditional tort law, falls far short of encroaching upon economic deregulation of the airline industry, and is indistinguishable from claims asserted in cases holding against federal preemption."); *Somes v. United Airlines, Inc.*, 33 F. Supp. 2d 78, 84 (D. Mass. 1999) (wrongful death action where emergency medical equipment was unavailable in-flight:  "literally applied, United's definition of 'services' amounts to an argument for total preemption — a proposition that has been rejected by the Supreme Court."); *Meinhold v. Trans World Airlines, Inc.*, 949 F. Supp. 758, 762 (C.D. Cal. 1996) ("Allowing a passenger to sue an airline that negligently drops a lap-top computer stored in an overhead bin certainly will not interfere with Congress' goal of encouraging the 'development of an air transportation system driven to higher levels of innovation and efficiency by economic competition.'"); *Margolis v. United Airlines, Inc.*, 811 F. Supp. 318, 322-23 (E.D. Mich. 1993) (passenger injured when a luggage carrier fell from an overhead bin:  "A state common law claim based upon negligence and the standard of reasonable care does not purport to regulate the services that air carriers provide to their customers in exchange for their fares. . . . *Morales* does not by its express terms extend to claims brought by individuals based on the negligence of the airline or its employees. . . .  Congress has expressed no intent to preempt traditional state law claims for negligence in the ADA amendments to the Federal Aviation Act.").

### B.     No Implied Preemption

All Defendants argue that, "[i]n this case, both conflict and field preemption are implicated," stating that "[s]tate law is impliedly preempted in two circumstances:  where the state law in question directly conflicts with the federal law (known as 'conflict preemption') or if the federal scheme is 'so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.'. . . This latter species of preemption is sometimes called 'field preemption.'''  *See* AD Mem. at 21.

**No Conflict Preemption.**  In order to demonstrate "conflict preemption," Defendants must show that it is "a physical impossibility" to comply with both state and federal law, *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963), or that the state law is an obstacle to accomplishing Congress' full purposes and objectives, *California Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 581 (1987).  Manifestly, reasonable care cannot stand as an obstacle to "the highest possible degree of safety in the public interest."  *See* 49 U.S.C. § 44701(d)(1)(A).  Thus, courts reject a finding of "conflict preemption" in the area of aviation safety:

> [T]he allowance of state law remedies does not create an irreconcilable conflict between federal and state regulations.  Sunbird does not challenge the power of the FAA to adopt safety regulations or to certify aircraft as complying with those regulations. . . .  The regulations promulgated by the FAA are merely minimum safety standards and do not preclude a finding of negligence where a reasonable person would take additional precautions. . . .  [T]he allowance of state remedies does not frustrate the objectives of the Federal Aviation Act.  The purpose of the regulations is to protect those who fly in airplanes or who are affected by their flight. . . .  This goal would be enhanced rather than defeated by allowing a jury to consider whether the design of an aircraft is defective, despite the fact that the FAA has already issued a type certificate for the aircraft.

*Sunbird Air Servs. v. Beech Aircraft Corp.*, 789 F. Supp. 360, 362-63 (D. Kan. 1992).  *See also*, *e.g.*, *Monroe v. Cessna Aircraft Co.*, 417 F. Supp. 2d 824, 836 (E.D. Tex. 2006) ("There is not a conflict between the state causes of action alleged by Monroe and the federal [aviation]

19

regulations at issue in the case such that the causes of action are preempted by implied conflict preemption."); *Cleveland v. Piper Aircraft Corp.*, 985 F.2d 1438, 1445 (10th Cir. 1993) ("We find that [it] is not impossible to meet both state common law standards and the federal regulations."); *Public Health Trust v. Lake Aircraft, Inc.*, 992 F.2d 291, 295 n.5 (11th Cir. 1993) ("[T]he case we decide today presents no actual conflict. . . . Dee seeks to hold defendants liable for errors of omission:  he claims defendants should have exceeded the minimum federal standards for aircraft design, but failed to do so."); *O'Hern v. Delta Airlines, Inc.*, 838 F. Supp. 1264, 1267 (N.D. Ill. 1993) ("[A]llowing an air carrier to be sued on common law tort theories would not conflict with the goals of the Act: 'there is nothing inconsistent with Congress's goal of maximum safety and common law claims'" (quoting *Cleveland*, 985 F.2d at 1143)); *Holliday v. Bell Helicopters Textron, Inc.*, 747 F. Supp. 1396, 1401 (D. Haw. 1990) ("[N]othing in the FAA indicates that states may not require aircraft to be more safe or better designed.  In addition, compliance with more stringent safety standards established by state products liability law would not prevent defendant from complying with federal regulations that set lower standards. Accordingly, this court finds the state and federal laws are harmonious rather than discordant.").

**No Field Preemption.**  To demonstrate "field preemption," Defendants must establish that a federal scheme is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.'"  *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992).  Defendants purport to divine such Congressional intent in the field of aviation from snippets of legislative history about federal authority over aviation.  AD Mem. at 25 ("Congress has recognized that aviation security is the 'exclusive responsibility' of the FAA, leaving no space for state regulation of the same field.").  However, courts, including the Second Circuit,

recognize that the FAAct's express savings clause is a far truer guide, indicating clear

Congressional intent to leave room for state law:

> The [FAAct] contains a savings clause that states: "Nothing contained in this Act shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this Act are in addition to such remedies.". . . As other courts have held, <u>this section shows that Congress did not intend to occupy the field of airplane safety to the exclusion of the state common law</u>. . . . By its very words, the statute leaves in place remedies then existing at common law or by statute. . . . <u>There is nothing inconsistent with Congress's goal of maximum safety and common law claims.</u>
>
> ***
>
> We conclude that Congress has not indicated a "clear and manifest" intent to occupy the field of airplane safety to the exclusion of state common law. To the contrary, it appears through the savings clause that Congress has intended to allow state common law to stand side by side with the system of federal regulations it has developed.

*Cleveland*, 985 F.2d at 1442-43, 1444.

Citing this savings clause, the Second Circuit has held that the FAAct does not preempt

common law remedies. *See In re Air Crash Disaster at John F. Kennedy Int'l Airport*, 635 F.2d

at 74 ("the federal statute does not preclude common law remedies. 49 U.S.C. § 1506 (1976).").

*See also Trinidad*, 932 F. Supp. at 527 ("personal injury lawsuits invoking 'traditional elements

of tort law' are not preempted by federal law"); *Sakellaridis v. Polar Air Cargo, Inc.*, 104 F.

Supp. 2d 160, 163 (E.D.N.Y. 2000) ("the defendant's reliance on *Abdullah* is irrelevant. The

court of appeals for the Second Circuit has held that the FAA does not preempt state common

law claims."); *Skidmore v. Delta Air Lines, Inc.*, No. 99-CV-2958-G, 2000 U.S. Dist. LEXIS

18587, at *11-12 (N.D. Tex. Dec. 15, 2000) ("the state, rather than the federal, standard of care

should be applied in state personal injury negligence claims against air carriers"); *accord*

*Monroe*, 417 F. Supp. 2d at 836 ("The field of aviation safety is not preempted by the Federal

Aviation Act. There is not sufficient evidence of a clear intent by Congress to preempt, neither

through a pervasive scheme of federal regulations set forth by the FAA nor within the Act's text

21

and legislative history."); *Holliday*, 747 F. Supp. at 1398 ("Where Congress has not enacted an explicit preemption clause, state law may still be displaced if an intent to preempt is 'implicitly contained in [the federal statute's] structure and purpose.' . . . Section 1506 of the FAA is a savings clause, which specifically precludes a finding of such Congressional intent."); *Skydive Factory, Inc. v. Me. Aviation Corp.*, 268 F. Supp. 2d 61, 64 (D. Me. 2003) (FAA savings clause evidence that FAAct does not "eliminate common law damage remedies"). *See generally Wardair Canada, Inc. v. Florida Dep't of Revenue*, 477 U.S. 1, 5-6 (1986) (FAAct did not "'occupy the field' of international aviation").[8]

Given the clear indication of Congressional intent with respect to aviation law, the Supreme Court's ruling in *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238 (1984), with respect to nuclear safety, is apt here:

> It may be that the award of damages based on the state law of negligence or strict liability is regulatory in the sense that a nuclear plant will be threatened with damages liability if it does not conform to state standards, but that regulatory consequence was something that Congress was quite willing to accept.

464 U.S. at 256.

Defendants rely primarily on the Third Circuit decision in *Abdullah*, in which the court expressly acknowledged that its decision was contrary to Second Circuit precedent. "In coming to our answers to the certified question, we depart from the precedent established by a number of

---

[8]    Defendants mischaracterize the Second Circuit's decision in *Drake v. Labs. Corp.*, 458 F.3d 48 (2d Cir. 2006). *See* AD Mem. at 20-21. *Drake* did not address the general issue of preemption in aviation cases. It was a drug testing case, and the FAA drug testing regulations at issue contained an express preemption provision that foreclosed "any state or local law, rule, regulation, order, or standard *covering the subject matter* of" the drug testing regulations. 458 F.3d at 58 (citing 14 C.F.R. § 121, App. I § XI(A) (emphasis in original)). While the Aviation Defendants quote liberally from a paragraph in the *Drake* opinion (AD Mem. at 23-24), they make no mention of the last sentence of that paragraph that cited, quoted and relied upon the text of the regulation — "covering the subject matter" — in finding preemption. 458 F.3d at 58. Far from supporting preemption in aviation cases generally, the *Drake* case affirmatively demonstrates that when the FAA wishes to preempt state regulation within its purview, it knows how to do so. No such provision can be found in any regulation at issue in *this* case.

cases which hold that federal law does not preempt any aspect of air safety.  *See In re Air Crash Disaster at John F. Kennedy Int'l Airport*, 635 F.2d 67, 74-75 (2d Cir. 1980); *Trinidad v. American Airlines*, 932 F. Supp. 521 (S.D.N.Y. 1996)."  *Abdullah*, 181 F.3d at 368.

In addition, *Abdullah* is founded on several errors:

First, it relies on *City of Burbank v. Lockheed Air Terminal, Inc*., 411 U.S. 624, 639 (1973), which does not stand for field preemption in the general area of airline safety.  Rather, it invalidated a specific municipal noise control ordinance that would have interfered with specifically calibrated air traffic flow.  Judge Scheindlin, in *Trinidad*, correctly rejected as inapplicable *Burbank* and similar "cases American cites concern[ing] the preemption of municipal ordinances or regulations that specifically address the operation or regulation of airlines."  932 F. Supp. at 527.

Second, *Abdullah* incorrectly states that *Cleveland* and its progeny blindly rely on the interplay between the maxim *expressio unius est exclusio alterius* and the preemption provision of the ADA, which *Abdullah* considered to be an "economic deregulation statute . . . inapposite to resolving preemption questions relating to air safety operations."  *Abdullah*, 181 F. 3d at 368.  On the contrary, *Cleveland* and other decisions in its camp addressed not only the ADA but also potential factual bases for implied conflict or field preemption in determining that state standards of care were not preempted.  In fact, the *Abdullah* opinion later acknowledges that "the court in *Cleveland* compared the state common law duties and the federal regulatory framework to determine whether there was an actual conflict."  *Id.* at 374 .

Finally, *Abdullah* misconceives the holding in *Silkwood*, on which *Abdullah* relies to rationalize its ruling that, "[e]ven though we have found federal preemption of the standards of aviation safety, we still conclude that the traditional state and territorial law remedies continue to

exist for violation of those standards." *Abdullah*, 181 F.3d at 375.  *Abdullah* overlooked that

*Silkwood* clearly left intact a state law standard of care:

> It may be that the award of damages based on the state law of negligence or strict liability is regulatory in the sense that a nuclear plant will be threatened with damages liability <u>if it does not conform to state standards,</u> but that regulatory consequence was something that Congress was quite willing to accept.

464 U.S. at 256.[9]

## POINT III

### A Common Law Standard of Care Is Not Inconsistent with Federal Law

Defendants invent from whole cloth an argument that the phrase "inconsistent with"

broadens the scope of federal preemption, asserting that the ATSSSA "bars liability premised on

any law that is inconsistent with the federal scheme of aviation security, even if that

inconsistency would not in other contexts rise to the level of preemption."  AD Mem. at 30.

---

[9]     Defendants' reliance on *Ospina v. Trans World Airlines, Inc.*, 975 F.2d 35 (2d Cir. 1992) for the notion that FAA regulations preempt the standard of care in a negligence case is puzzling. *Ospina* addressed the sufficiency of proof of willful misconduct in a case involving the Warsaw Convention.  It had nothing to do with preemption and did not even address the standard of care in an aviation negligence case.  *Compare Stanford v. Kuwait Airways Corp.*, 89 F.3d 117, 124 (2d Cir. 1996) (addressing ordinary negligence principles:  if an airline, "in the exercise of ordinary care, should have recognized that under the circumstances, knowing what it knew, there was an unreasonable risk of hijacking to passengers aboard its flight and other connecting flights, then the jury [can] find that [the air carrier] should have implemented secondary screening measures or warned other [air carriers] of a possible threat of hijacking."); *see also Lockerbie*, 37 F.3d at 815 (compliance with FAA regulations "not dispositive of the outcome" of a Warsaw Convention case).

    Defendants' citation to *Witty v. Delta Air Lines, Inc.*, 366 F.3d 380 (5th Cir. 2004) is also misplaced.  *Witty* expressly limited its holding to the facts of the case:  whether an advisory to passengers about how to lessen the risk of suffering a deep vein thrombosis in the leg must be given at the commencement of a commercial flight.  *Id.* at 385-86 ("[W]e note our intent to decide this case narrowly by addressing the precise issues before us. . . . We do not, for example, express an opinion as to whether emergency or unplanned situations on flights can form the basis of a state failure to warn claim that is not preempted."); *Monroe*, 417 F. Supp. 2d at 829 ("*Witty* is a narrow opinion. . . . The Fifth Circuit repeatedly limited its holding to the specific facts and 'precise' issues before the court."  Witty does not stand for the proposition that "any product design defect case, including a failure to warn case, is preempted if the plaintiff does not prove that a federal standard of care set by FAA regulations was violated.").

Defendants cite no authority for the proposition that the term "inconsistent with" creates an expansive bar that applies "even if that inconsistency would not in other contexts rise to the level of preemption." The authorities are to the contrary. Courts addressing the phrase "inconsistent with" in the context of a preemption clause routinely equate such language with conflict preemption. *See, e.g., Metrophones Telecomms., Inc. v. Global Crossing Telecomms., Inc.*, 423 F.3d 1056, 1073 (9th Cir. 2005) ("In fact, our analysis of whether state requirements are 'inconsistent' with the federal regulations within the meaning of [the Communications Act, 47 USC § 276(c)] is substantially identical to the analysis of implied conflict preemption: whether 'state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"); *O'Brien v. Mass. Bay Transp. Auth.*, 162 F.3d 40, 43 (1st Cir. 1998) (Omnibus Transportation Employee Testing Act of 1991, Pub. L. No. 102-143, 105 Stat. 952, "unambiguously provides that '[a] State or local government may not prescribe, issue, or continue in effect a law, regulation, standard, or order that is inconsistent with regulations prescribed under this section.' . . . The plain language of these provisions bespeaks 'conflict preemption.'"); *Coalition to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 251 (6th Cir. 2006) ("[T]he Civil Rights Act says that it may not be 'construed as invalidating any provision of State law unless such provision is inconsistent with any of the purposes of this Act, or any provision thereof.' . . . That means plaintiffs must establish a form of 'conflict preemption,' which is to say they must show either that 'compliance with both federal and state regulations is a physical impossibility' or that 'state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"). As previously set forth, the principles of conflict preemption do not bar application of a state standard of care under the ATSSSA.

Nor do Defendants cite any authority for the proposition that the ATSSSA "only borrows from state law to fill in interstices because there is no general federal law of tort. Where there is federal law on point . . . the Stabilization Act is explicit that the federal law is exclusive and controlling." A.D. Mem. at 30. The statutory language mandates state law as the first resort, not the last: "The substantive law for decision . . . *shall be* derived from the law . . . of the State in which the crash occurred . . . ." ATSSSA § 408(b)(2). Thus, Defendants' argument is wholly at odds with the basic canon of statutory construction set forth in Defendants' own authority, *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979): "In construing a statute we are obliged to give effect, if possible, to every word Congress used." *See* AD Mem. at 31.

Although there is no legislative history of the ATSSSA addressing the precise meaning of "inconsistent" — understandably, given the circumstances in which the legislation was conceived — Congress has since had the opportunity to ponder identical language in other Homeland Security legislation, as Defendants point out. *See* AD Mem. at 35 (citing 6 U.S.C. § 442 (2002)); Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, 116 Stat. 2322; Public Readiness and Emergency Preparedness Act, 42 U.S.C. § 247d-6d (2005)).

Defendants speculate that "[t]his body of law strongly suggests that Congress intends the conduct of those charged with avoiding or responding to a terrorist attack to be judged by a uniform federal standard of care rather than a patchwork of potentially inconsistent state requirements." AD Mem. at 31. Defendants' speculation about the intent of these statutes is contrary to fact. The legislative history of the Terrorism Risk Insurance Act states:

> [T]he bill . . . avoids making this important economic package a Trojan horse for tort reform, a favorite of many in this body and many in the White House, some of whom worked long and hard for over a year to derail this bill in order to advance what I consider to be an ideological agenda at the expense of economic growth and the protection of American businesses.

26

> Rather, the bill before us tonight provides for prudent measures that protect the interests of taxpayers and maintains the legitimate rights of victims by, one, <u>creating an exclusive Federal cause of action **governed by applicable state law** for all suits for property loss, personal injury or death arising out of a terrorist event</u>; secondly, consolidating claims into a single Federal district court; and, third, ensuring that the Federal Government will not be directly or indirectly responsible in its role as a reinsurer for any punitive damages.

148 CONG. REC. H8803 (2002) (statement of Rep. LaFalce).

Equally futile is Defendants' argument that the Court, in interpreting Section 408(b)(2), will find support for Defendants' position in cases interpreting the Price-Anderson Amendments Act of 1988, Pub. L. No. 100-408, 102 Stat. 1066 (1988).  Defendants rely principally upon *In re TMI Litig. Cases Consol. II*, 940 F.2d 832 (3d Cir. 1991) and *O'Connor v. Commonwealth Edison Co.*, 13 F.3d 1090 (7th Cir. 1994), and cite numerous lower court decisions that reflexively apply those two.

*TMI* and *O'Connor*, however, were concerned primarily with the constitutionality of the 1988 Price-Anderson Act Amendments in light of Supreme Court jurisprudence that "pure jurisdictional statutes" that "seek 'to do nothing more than grant jurisdiction over a particular class of cases' cannot support Art. III 'arising under' jurisdiction.'"  *See Mesa v. California*, 489 U.S. 121, 136 (1989) (quoting *Verlinden B.V. v. Cent. Bank of Nig.*, 461 U.S. 480, 496 (1983)).  Consequently, both courts sought to broaden the extent to which the Price-Anderson Act "necessarily involve[d] application of a body of substantive federal law[.]"  *Verlinden*, 461 U.S. at 497.  These cases should not be determinative here.

Moreover, both courts focus on, and misconstrue, two Supreme Court cases regarding atomic energy law, stating peremptorily that "federal nuclear safety regulations preempt all state safety regulations."  *O'Connor*, 13 F.3d at 1104.  *See also TMI*, 940 F.2d at 858.  In fact, *Pacific Gas & Elec. Co. v. State Energy Conservation & Dev. Comm'n,* 461 U.S. 190, 208 (1983), addressed local regulation of nuclear energy plant <u>construction</u>.  It held that a California statute

imposing a moratorium on the certification of new nuclear plants until the state energy

commission found that there existed a demonstrated technology or means for the disposal of high

level nuclear waste was <u>not</u> pre-empted by the Atomic Energy Act.  This is precisely the type of

preemption issue, however, that is irrelevant to a question of whether state tort standards of care

conflict or interfere with safety regulation.  *See Trinidad*, 932 F. Supp. at 527 ("[T]he cases

American cites concern the preemption of municipal ordinances or regulations that specifically

address the operation or regulation of airlines. . . . These cases are completely different from the

case at bar.  Plaintiffs' claims implicate no local ordinances or regulations.  Rather, Plaintiffs

have brought tort claims for personal injuries which they contend are the result of Defendant's

negligence.").  As for *Silkwood*, both *TMI* and *O'Connor* fail to account for the Supreme Court's

explicit ruling that "violation of state standards" can provide a basis for tort liability

notwithstanding any purported field preemption in the area of safety regulation:

> [I]t is clear that in enacting and amending the Price-Anderson Act, Congress
> assumed that state-law remedies, in whatever form they might take, were
> available to those injured by nuclear incidents.  This was so even though it was
> well aware of the NRC's exclusive authority to regulate safety matters.  No doubt
> there is tension between the conclusion that safety regulation is the exclusive
> concern of the federal law and the conclusion that a State may nevertheless award
> damages based on its own law of liability.  But as we understand what was done
> over the years in the legislation concerning nuclear energy, Congress intended to
> stand by both concepts and to tolerate whatever tension there was between them.
> We can do no less.  <u>It may be that the award of damages based on the state law of</u>
> <u>negligence or strict liability is regulatory in the sense that a nuclear plant will be</u>
> <u>threatened with damages liability if it does not conform to state standards, but that</u>
> <u>regulatory consequence was something that Congress was quite willing to accept</u>.

*Silkwood*, 464 U.S. at 256.  Neither *TMI* nor *O'Connor* warrants further analysis of the

jurisprudence of federal preemption in the field of nuclear regulation.

POINT IV

**The Applicable Standard of Care is**
**Reasonableness Under The Circumstances**

The standard of care by which Defendants' conduct on September 11th must be measured is the traditional state common law standard of reasonableness under the circumstances. Whether the Defendants satisfied that standard of care requires a three-factor analysis: (1) whether Defendants complied with all FAA regulations, the ACSSPs, the ASPs, and the COGs in a manner that was reasonable under the circumstances; (2) whether Defendants complied with their federal statutory duty to provide service with the highest possible degree of safety in the public interest in a manner that was reasonable under the circumstances; and (3) whether Defendants took all additional steps needed to avoid causing harm to their passengers and to persons and property on the ground that a reasonably prudent air carrier, security company, airport operator or aircraft designer would have taken under the circumstances.

This is the standard of care that has been applied by courts in aviation safety and security cases both prior to and after September 11th.  Nothing in the ATSSSA or its legislative history suggests that Defendants' liability for the September 11th air crashes should be adjudicated by applying a different standard of care.

The ATSSSA created an exclusive federal claim in order to vest exclusive jurisdiction for all 9/11 claims in the United States District Court for the Southern District of New York. *Canada Life Assurance Co. v. Converium Ruckversicherung (Deutschland) AG*, 335 F.3d 52, 55 (2d Cir. 2003).  The purpose of vesting exclusive jurisdiction in this Court was "the avoidance of the undesirable effects that litigation of September 11 claims in the various state and federal courts would inevitably produce."  *Id.* at 59.

29

It was necessary to create a federal cause of action to avoid constitutional problems because federal courts cannot have exclusive jurisdiction over state tort causes of action absent some Article III basis for jurisdiction. The federal claim was not created, as Defendants have suggested, to preclude the application of the common law principle of "reasonableness under the circumstances" to Plaintiffs' claims.

A.     **Reasonable Compliance With FAA
       Regulations, the ACSSPs, ASPs and the COGs.**

The federal aviation safety and security "statutory scheme anticipates <u>a common effort by air carriers and the agency to respond to changing circumstances</u> in aviation to ensure a safe flying environment." *Eastern Air Lines, Inc.*, 792 F.2d at 1563. "Certainly, an allegation of a regulatory violation must be tested against <u>a standard of reasonableness</u>." *Id*. at 1563.

Courts routinely apply a reasonableness standard in evaluating violations of FAA statutory or regulatory duties. For example, in a lawsuit brought by the federal government against an air carrier to impose a civil penalty for violation of the FAA regulation requiring that the carrier prevent or deter passengers from bringing weapons aboard, the court held that the appropriate standard of care was whether the carrier prevented a weapon from being brought aboard "when it may reasonably be achieved" and whether such violation was deterred "where prevention cannot so be achieved." *United States v. Ozark Air Lines, Inc*., 419 F. Supp. 795, 798 (E.D. Mo. 1976); s*ee also United States v. S.A. Empresa de Viacao (Varig Airlines),* 467 U.S. 797, 804, 806 (1984) (FAA regulations establish "minimum standards for aircraft design, materials, workmanship, construction, and performance;" a certificate is granted if minimum regulations are complied with).

Thus, even *Abdullah* establishes that FAA regulations incorporate the common law reasonableness standard of care. *See Abdullah*, 181 F.3d at 374. 14 C.F.R. § 91.13, in

prohibiting the careless or reckless operation of an aircraft, "simply restates the general common

law [standard of] reasonable care (*i.e.*, they may not be careless)." *Joy v. Bell Helicopter*

*Textron, Inc.*, 999 F.2d 549, 558 (D.C. Cir. 1993); *accord Avemco Ins. Co. v. Elliott Aviation*

*Flight Servs.,* 86 F. Supp. 2d 824, 832 (C.D. Ill. 2000).

#### B.    Compliance with the Federal Statutory Duty to Provide Service With the Highest Possible Degree of Safety in the Public Interest

Federal law imposes a duty directly upon Defendants to provide service with the "highest

possible degree of safety in the public interest" (49 U.S.C. §§ 44701(d), 44702(b)(1)(A) — a

duty that applies "irrespective of any action taken or not taken by an individual FAA inspector or

the FAA." FAA Handbook 8400.10 CHG 10, at 1-59 (Dec. 20, 1994), Plaintiffs' Dec. Exh. 4;

FAA Handbook 8300.10 at 6-4 to 6-6, Plaintiffs' Dec. Exh. 8; *see also S.A. Empresa de Viacao*

*(Varig Airlines)*, 467 U.S. at 804 ("Congress emphasized, however, that air carriers themselves

retained certain responsibilities to promote the public interest in air safety:  the duty to perform

their services with the highest possible degree of safety . . . and  the duty to observe and comply

with all other administrative requirements established by the Secretary."); *Williams v. Trans*

*World Airlines*, 509 F.2d 942, 946 n.8 (2d Cir. 1975) ("TWA was and is required to perform its

services with the highest degree of safety in the public interest . . .  This duty has both a statutory

and common law basis . . .");[10] *Ozark,* 419 F. Supp. at 798 (the statutory duty of an air carrier

under the FAAct is to "conduct searches of the carry-on baggage of boarding passengers <u>with the</u>

<u>highest possible degree of care</u>."); *In re Trans World Airlines, Inc.*, FAA Order No. 1999-12,

---

[10]       TWA in its Brief to the Second Circuit wrote: "As an air carrier under the Federal
Aviation Act of 1958, TWA is required to perform its services with the highest possible degree
of safety in the public interest.  Judge Leval noted that the special nature of air transportation
has been recognized by Congress and the courts.  The Act directs the Secretary of Transportation to
be ever mindful of the extremely high standard of care that is required of airlines."  July 25, 1974
Brief of Trans World Airlines in *Williams v. Trans World Airlines*, Plaintiffs' Dec. Exh. 18, at 9.

1999 WL 1125387 at *3 (Aug. 23, 1999) ("[A]ir carriers have a statutory mandate to perform

their services <u>with the highest possible standard of care</u>."); *see also Coupe v. Federal Express*

*Corp.*, 121 F.3d 1022, 1025 n.1 (6th Cir. 1997) ("the 'highest degree of safety in the public

interest' *is* 'reasonably necessary' to . . . aircraft operations."); *Landy*, 705 F.2d at 636 ("[t]he

Federal Aviation Act requires carriers 'to perform . . . services with the highest degree of

safety'").

### C.    The Duty to Take All Additional Steps That a <u>Reasonably Prudent Person Would Take to Avoid Causing Harm</u>

Defendants were also required to take the necessary additional steps to avoid causing

harm to Plaintiffs that a reasonably prudent air carrier, security company, airport operator and

aircraft designer would have taken under the circumstances.  *See, e.g., In re Air Crash Disaster*

*at John F. Kennedy Int'l Airport on June 24, 1975*, 635 F.2d at 74-77 (District Court "properly

instructed the jury as to the duty of the Eastern Crew to use all reasonable means and information

to avoid a crash"); *Stanford,* 89 F.3d at 123-124 ("The alleged tortfeasor must exercise such

attention of the circumstances and knowledge of other pertinent matters, intelligence and

judgment as a reasonable person would have — and, such *superior* attention, knowledge,

intelligence, and judgment as the actor himself happens to possess. . . . If MEA [the airline], in

the exercise of ordinary care, should have recognized that under these circumstances, knowing

what it knew, there was an unreasonable risk of hijacking to passengers aboard its flight and

other connecting flights, then the jury could find that MEA should have implemented secondary

screening measures or warned other interline members of a possible threat of hijacking.")

(internal ellipses and brackets omitted).  *See also Monroe*, 417 F. Supp. 2d at 827 (state standard

of care in negligence and strict products liability claims against aircraft manufacturer); *Japan*

32

*Airlines Co. v. Port Auth. of N.Y. and N.J.*, 178 F.3d 103, 109-10 (2d Cir. 1999) (airport operator required to maintain airport in reasonably safe manner for benefit of passengers).

"The test of whether or not the airline properly exercised its power [under the FAAct and FAA regulations] . . . to refuse passage to an applicant" who might be a hijacker was whether "it was reasonable under the circumstances for [the air carrier] to refuse to transport" such person. *Williams,* 509 F.2d at 946, 948; *accord Zervigon v. Piedmont Aviation, Inc.*, 558 F. Supp. 1305, 1306 (S.D.N.Y. 1983) (Weinfeld, J.) (decision to remove eight passengers because of a potential threat of hijacking was reasonable in light of the totality of the circumstances); *Stanford*, 89 F.3d at 123-124 (knowing that there is a "risk of hijacking to passengers aboard [a] flight and other connecting flights, then the jury [can] find that [the air carrier] should have implemented secondary screening measures or warned other [air carriers] of a possible threat of hijacking."); *In re Air Crash Disaster at John F. Kennedy Int'l Airport on June 24, 1975*, 635 F.2d at 74 (the duty of an air carrier is "to use all reasonable means and information to avoid a crash" including using one's "own eyes and ears to offset obvious negligence by another.").

In *DiBenedetto v. Pan Am World Servs.*, 359 F.3d 627 (2d Cir. 2004), the Second Circuit did not address the issue of preemption but expressed "no doubt" as to the duty and standard of care in a case arising out of allegedly negligent security operations at an airport:

> Here, we have no doubt that the requisite duty existed. Pan Am (and through them, Alert) had a duty of care to Di Benedetto arising out of Pan Am's control over the baggage terminal in which Di Benedetto worked. *See Stagl*, 52 F.3d at 467 … Aeroflot also doubtless owed the plaintiff a duty to exercise "ordinary care commensurate with the existing circumstances." *Stagl,* 52 F.3d at 417 n.5 . . . . We have no doubt, for example, that if [an air carrier] had negligently allowed a bomb to be placed on one of its flights, and that bomb eventually exploded in another airline's terminal or in another airline's baggage claim area, [the air carrier] would have breached a duty to the individual working and passing through those places," because the "carrier must reasonably take cognizance of the habits, customs and practices followed generally by its passengers insofar as

these actions present hazards . . ., and with an awareness of these hazards, it <u>must take reasonably appropriate steps to avoid or minimize the likely harm</u>."

359 F.3d 627 at 630.

The standard of care governing aircraft designers like Boeing is no different. "The regulations promulgated by the FAA are merely minimum safety standards and do not preclude a finding of negligence where a reasonable person would take additional precautions." *Sunbird*, 789 F. Supp. at 363.[11]

---

[11]    Although the Court authorized only one joint brief on the standard of care, the Airport Operators and Boeing each submitted briefs on this issue, while further joining in the Aviation Defendants' motion. The Airport Operators' and Boeing's arguments are largely duplicative of the arguments made by the Aviation Defendants (*see* AO Mem. at 6-23; Boeing Mem. at 15-26) and fail for the same reasons. Nothing would preclude application of the common law standard of care to these Defendants. Indeed, as the common law standard is not "inconsistent with or preempted by" by FAA regulations that Boeing <u>concedes</u> are "'minimum standards required in the interest of safety . . . for the design' . . . of aircraft and aircraft components" (Boeing Mem. at 20), the jury is entitled to judge whether Boeing breached the common law standard of care in failing to design the aircraft used in the September 11 attacks "in a way that hijackers could not gain access to the cockpit and/or could not take control of and fly the aircraft." *See, e.g.,* Amended Cross-Claims by the WTCP Entities against Certain Defendants in Plaintiffs' Amended Flight 11 Master Liability Complaint, pp. 17-20 (Plaintiffs' Dec. Exh. 3). The Airport Operators' motion additionally seeks a ruling now from this Court that the FAA regulations at issue defined the existence and scope of their <u>duty</u> on September 11th, namely that that Airport Operators' <u>duty</u> was limited to security for areas at the airports to the exclusion of the checkpoints (*see* AO Mem. at 6). The Airport Operators' argument is premature, off point, and should be rejected.

34

**<u>Conclusion</u>**

For all of the foregoing reasons, Plaintiffs respectfully request that this Court reject the Aviation Defendants' arguments and enter an Order determining that the standard of care by which Defendants' actions or inactions on September 11, 2001, must be measured is the standard of reasonableness under the circumstances, taking into account:  (1) whether Defendants complied with all FAA regulations, the ACSSPs, the ASPs and the COGs in a manner that was reasonable under the circumstances; (2) whether Defendants complied with their federal statutory duty to provide service with the highest possible degree of safety in the public interest in a manner that was reasonable under the circumstances; and (3) whether Defendants took all additional steps needed to avoid causing harm to their passengers and to persons and property on the ground that a reasonably prudent air carrier, security company, airport operator and aircraft designer would have taken under the circumstances.

Dated:  May 25, 2007
        New York, New York

Respectfully submitted,

**KREINDLER & KREINDLER LLP**                 **CLIFFORD LAW OFFICES**


By: __s/Marc S. Moller_____              By: __s/Robert A. Clifford_____
        Marc S. Moller                                Robert A. Clifford
100 Park Avenue                               120 N. LaSalle Street, 31st Floor
New York, New York 10017                      Chicago, IL 60602
(212) 687-8181                                (312) 899-9090
*Liaison Counsel for PI/WD Plaintiffs*        *Liaison Counsel for PD/BL Plaintiffs*


**MOTLEY RICE LLC**                           **FLEMMING ZULACK WILLIAMSON
                                              ZAUDERER, LLP**


By: __s/Ronald L. Motley_____              By: __s/Richard A. Williamson___
        Ronald L. Motley                              Richard A. Williamson
28 Bridgeside Boulevard                       One Liberty Plaza
Mount Pleasant, SC 29465                      New York, New York  10006
(843) 216-9000                                (212) 412-9500
*Attorneys for Plaintiffs*                    *Attorneys for Cross-Claim Plaintiffs*
                                              *World Trade Center Properties LLC*
                                              *1 World Trade Center LLC*
                                              *2 World Trade Center LLC*
                                              *4 World Trade Center LLC*
                                              *5 World Trade Center LLC*
                                              *7 World Trade Company, L.P.*


**GREGORY P. JOSEPH LAW
OFFICES LLC**


By: __s/Gregory P. Joseph_____
        Gregory P. Joseph, Esq.
805 Third Avenue, 31st floor
New York, NY 10022
(212) 407-1200
*Member, PD/BL Executive Committee*
*Attorneys for Plaintiff IRI*

36